No. 94,295

STATE OF KANSAS, *Appellee*, v. JEREMY L. HERNANDEZ, *Appellant*.

(159 P.3d 950)

Opinion filed June 8, 2007.

*Sarah Ellen Johnson*, of Kansas Capital Appellate Defender Office, argued the cause and was on the brief for appellant.

*Kristafer R. Ailslieger*, assistant attorney general, argued the cause, and *Phill Kline*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Jeremy Hernandez appeals from his conviction of first-degree murder and from the trial court's imposition of his hard 40 sentence. The defendant contends that his conviction and sentence must be reversed based upon the following claims of error: (1) prosecutorial misconduct involving comments on his right to remain silent; (2) the admission of hearsay evidence; (3) the admission of repetitious, gruesome photographs; (4) the unconstitutionality of Kansas' hard 40 sentencing scheme; and (5) the insufficiency of evidence to support his hard 40 sentence. We consider each of his claims, find no reversible error occurred, and affirm.

*Facts*

Tina Davidson's body was found at her residence on November 26, 1995, when police went to her home in Independence, Kansas, to investigate reports of an abandoned vehicle. The body, discovered in Davidson's kitchen, was severely slashed and mutilated; it was evident that she was dead.

The police investigation revealed a trail of blood drops from Davidson's body, through the living room, on the front door knob, out the front door, and down the front sidewalk. The police collected samples of the blood drops for analysis; the blood did not match that of the victim. A DNA profile of the unknown blood sample was entered into the national Combined Offender DNA Index System (CODIS) database. Despite the ongoing investigation, Davidson's murder remained unsolved for 8 years.

No match was found for the DNA from the blood samples until 2003. The defendant was incarcerated on an unrelated charge, and his DNA profile was subsequently entered into the CODIS database. The defendant's DNA matched the DNA in the blood drops from the trail leading out of Davidson's house. Additional testing of the defendant's DNA, which was then compared with the blood collected from Davidson's residence, yielded 23 perfect DNA matches and 11 bloodstains that were consistent with the defendant's DNA.

After the police found that the defendant's DNA matched the blood at Davidson's murder scene, the police interviewed him. According to the testimony of the officers, the defendant initially waived his *Miranda* rights and agreed to speak with them. See *Miranda v. Arizona*, 385 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966). He informed the investigators that he did not know Davidson, and he denied that he was ever at her house. The defendant then invoked his right to remain silent and the interview ended.

A jury trial was held in October 2004. Among other witnesses called by the State, the prosecution called Dr. Gregory Mears, the coroner at the original crime scene, and Dr. Jill (Gould) Cobb, the pathologist who performed the autopsy. Dr. Mears testified that Davidson had multiple slash wounds across her neck and throat that were long and "very deep." He also noted that her hands were lacerated, indicating that she bore "defense wounds" from attempting to prevent the attacker from slashing her throat. He summarized, saying, "This involved multiple lacerations. This was very violent. Patient was defending herself and the thought of dying like this causes me to shudder. This is a tremendously bad way to die." Dr. Cobb testified in detail regarding Davidson's injuries, assisted by the introduction of 26 photographs, which were admitted over the defendant's counsel's objection.

The defendant testified on his own behalf and related that on the night in question he gave Davidson a ride home because her car broke down. When they arrived at her house, she invited him in. He stated that while he and Davidson were in her kitchen, another man walked in from the living room, became angry, and began threatening both the defendant and Davidson. He testified that the man pushed him and swung at him with a knife, cutting him on his hand. The defendant explained that the man then began fighting with Davidson, and he hurried out of the house.

The defendant stated that he did not know that Davidson had been murdered until 2 weeks later. At no time between the date of the murder and the date he was charged with the murder did the defendant ever relate his version of the story to the police; in

fact, the defendant's trial testimony was the first time the State heard what he claimed to have happened.

Jessica Hernandez, the defendant's wife, was called as a witness by the State. She testified that while she and the defendant were dating, he had asked her if she "knew what a lot of blood smelled like." According to her testimony, he then told her that he had been involved in a murder in Independence, and that he had "driven a friend to someone's house, and he [defendant] had sat and watched while [his friend] killed her." Jessica explained that the defendant had told her that "nothing really came up of" the murder because the police "didn't have evidence and it just couldn't be solved, like an unclosed case."

In his testimony, the defendant acknowledged that he *had* told Jessica about Davidson's murder and that he might have seen the person who did it. However, he stated that when he told her, Jessica acted like she did not hear him.

The jury found the defendant guilty of murder in the first degree. At sentencing, the trial court found that the murder was committed in an "especially heinous, atrocious, and cruel manner by the infliction of mental anguish or physical abuse before the victim's death and that the desecration of the victim's body before the killing indicates a particular depravity of mind." The trial court sentenced the defendant to life imprisonment with no possibility of parole for 40 years (hard 40).

(1) Prosecutorial Misconduct by Commenting on the Defendant's Right to Remain Silent

The defendant contends that the State committed reversible error by questioning him during cross-examination as to why he had not before volunteered his version of the events of the night of Davidson's death and reiterating in closing argument that he had not told anyone at any time before the trial about the other man allegedly at Davidson's house. He acknowledges that the State did not directly comment on his silence after being arrested, but claims that the prosecutor through questioning and closing argument implicitly and impermissibly referred to his postarrest, post-*Miranda* silence.

In *Doyle v. Ohio*, 426 U.S. 610, 619, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), the United States Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment" to the United States Constitution. Instead of claiming that the State directly violated his constitutional rights under *Doyle*, the defendant frames the alleged *Doyle* violations as instances of prosecutorial misconduct. We note that a defendant ordinarily waives a claim for a *Doyle* violation by not objecting at trial to a prosecutor's question or other conduct that implicates the defendant's postarrest silence. See *State v. Fisher*, 222 Kan. 76, 83-84, 563 P.2d 1012 (1977). However, this court does not always require an objection by defense counsel before considering an allegation of prosecutorial misconduct. See *State v. Swinney*, 280 Kan. 768, 779, 127 P.3d 261 (2006). We need not discuss the potential conflict raised by these decisions in this case since trial counsel did raise an appropriate objection under *Doyle*, which was sustained by the trial court with directions to the prosecutor as to what questions would be permitted. Under these circumstances, we consider the defendant's claims of prosecutorial misconduct.

*Standard of Review*

Appellate review of an allegation of prosecutorial misconduct requires a two-step analysis. First, an appellate court decides whether the comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, the appellate court decides whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *Sweeney*, 280 Kan. at 779. In the second step of this two-step analysis, the appellate court considers three factors:

"(1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence is of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors, unless the harmless error tests of both K.S.A. 60-261 [refusal to grant new trial is inconsistent

with substantial justice] and *Chapman* [*v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (conclusion beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial)] have been met. [Citations omitted.]" 280 Kan. at 780.

*Doyle and Postarrest Silence*

The use for impeachment purposes of a defendant's silence, at the time of arrest and after receiving *Miranda* warnings, violates the Due Process Clause of the Fourteenth Amendment. See *Doyle*, 426 U.S. at 619. We adopted the *Doyle* holding in *State v. Mims*, 220 Kan. 726, Syl. ¶ 1, 556 P.2d 387 (1976). Mims was charged and convicted of felony murder based on an underlying robbery. Mims' primary defense was alibi. He testified that he was with his mother reupholstering a couch the morning of the murder. On cross-examination, the prosecutor put the following question to the defendant: " 'Tell me this, Mr. Mims, how come you didn't tell this to the police about where you were on this particular day?' " 220 Kan. at 729. Reviewing this question, this court explained:

"We interpret the decision of the United States Supreme Court in *Doyle* to settle the question so as to make it constitutionally impermissible for a state prosecutor to impeach a defendant's exculpatory story told for the first time at the trial by cross-examining him as to his post-arrest silence after receiving the [*Miranda*] warnings." 220 Kan. at 730.

Reviewing the facts in that case, however, this court held that "the single question propounded by the prosecutor which was never answered and to which an objection was sustained constituted harmless error beyond a reasonable doubt in view of the overwhelming evidence of the defendant's guilt disclosed in the record." 220 Kan. at 731.

In *State v. Heath*, 222 Kan. 50, 563 P.2d 418 (1977), we again applied *Doyle*, this time overturning Heath's conviction. Heath was found guilty of burglary and felony theft. As in *Mims*, he claimed on appeal that the prosecutor had impermissibly made reference to his postarrest silence to impeach his alibi testimony. Among other questions asked by the prosecutor during cross-examination, the following exchange took place:

" 'Q. Over four months has elapsed in this interim since October 31, 1974 [the date Heath was charged], and this is the first time that this explanation has come forth, is that correct?

. . . .

" 'A. . . . The first time it has been out in court, yeah.
" 'Q. The first time that the State has been aware of it, isn't that right?
" 'A. Yeah, I guess.
" 'Q. Well, if you had an alibi, if you had a person that would corroborate what you are now testifying to, why is it that you decided that you didn't want to tell the State about it?
" 'A. The State never asked me.

. . . .

" 'Q. But at the same time you decided that it would not be in your best interest to tell them that, in fact, at the time you had an alibi?
" 'A. No.' " 222 Kan. at 53.

The prosecutor also made reference to Heath's failure to provide the alibi in the 4 months since he was charged until the trial during closing argument. The *Heath* court concluded that "[t]here can be little doubt the rule in *Doyle* and *Mims* was violated in the present case." 222 Kan. at 53. Moreover, the court found that the prosecutor's error in referring to Heath's postarrest silence could not be harmless:

"[T]here was no testimony indicating his actual participation in the burglary and theft other than his presence and participation as an aider and abettor. The cross-examination and closing argument was a direct attack upon defendant's defense of alibi. Due to the persistence of the prosecutor we are 'not able to say that these errors had little, if any, likelihood of having changed the result of the trial." 222 Kan. at 54.

In *State v. Clark*, 223 Kan. 83, 574 P.2d 174 (1977), this court considered whether *Doyle* barred prosecutors from commenting on a defendant's postarrest silence even after an accused carries on a limited discussion with police officers. Clark was convicted of felony theft and burglary. The night he was arrested, Clark apparently spoke with police officers but neither was asked about nor provided information on his alibi. In particular, Clark made no mention of alibi witnesses during the police interrogation, though he testified at trial that 11 people could vouch for him that he could not have been present when the crime took place.

At trial, the prosecutor drew attention to this·omission in both the cross-examination of Clark and during closing argument. The *Clark* court recognized the principle in *Doyle* that "[w]hen an accused elects to testify in his own behalf, his post-arrest silence may not be used solely to impeach his exculpatory testimony." 223 Kan. at 85. The court held that the defendant had no duty to volunteer his alibi witnesses, so the prosecutor could not use the defendant's failure to provide the alibi witnesses during the interrogation to impeach his later testimony at trial. 223 Kan. at 87-89. The court reasoned:

> "An accused may remain completely silent, and he is under no duty to volunteer his exculpatory story. Thus, he should be afforded the same right after some discussion with the police when he remains silent as to matters later asserted at trial. We hold *Doyle* prohibits a state prosecutor from impeaching a defendant's alibi defense told for the first time at trial, when the defendant carried on limited discussion with police after arrest, but remained silent as to matters subsequently asserted at his trial." 223 Kan. at 89.

Although, as the above cases illustrate, it is well established that a prosecutor may not use the postarrest silence of the defendant to impeach his or her later testimony, it is also well settled that a prosecutor *may* use a defendant's prearrest silence to impeach the defendant at trial. This holding was articulated by the United States Supreme Court in *Jenkins v. Anderson*, 447 U.S. 231, 65 L. Ed. 2d 86, 100 S. Ct. 2124 (1980), 4 years after its decision in *Doyle*.

In *Jenkins*, the defendant was convicted of first-degree murder. Jenkins had turned himself in to the authorities for the murder 2 weeks after it happened, but he claimed he killed the victim in self-defense. On appeal, Jenkins argued that the prosecutor at trial repeatedly referred to the fact that Jenkins had waited 2 weeks before surrendering himself to the police, denying him the right to a fair trial.

The *Jenkins* Court recognized that "[c]ommon law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted. 3A J. Wigmore, Evidence § 1042, p. 1056 (Chadbourn rev. 1970)." 447 U.S. at 239. The Court explained its deviation from this recognized principle in *Doyle*, explaining that

"*Miranda* warnings inform a person that he has the right to remain silent and assure him, at least implicitly, that his subsequent decision to remain silent cannot be used against him. Accordingly, ' "it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony." '." 447 U.S. at 239-40 (quoting *Doyle*, 426 U.S. at 619).

*Jenkins* concluded, however, that there was no *Doyle* (or other due process) violation in the facts before it, where the prosecutor referenced Jenkins' silence prior to his arrest. The Court explained that "no governmental action induced petitioner to remain silent before arrest. The failure to speak occurred before the petitioner was taken into custody and given *Miranda* warnings. Consequently, the fundamental unfairness present in *Doyle* is not present in this case." 447 U.S. at 240. Thus, the Court held that "impeachment by use of prearrest silence does not violate the Fourteenth Amendment." 447 U.S. at 240.

In his concurrence, Justice Stevens explained the Court's holding, stating that "the privilege against compulsory self-incrimination is simply irrelevant to a citizen's decision to remain silent when he is under no official compulsion to speak." *Jenkins*, 447 U.S. at 241 (Stevens, J., concurring). The justice differentiated the privilege against self-incrimination at trial from the right asserted in the case presently before the Court, explaining:

"These reasons [behind the constitutional privilege against self-incrimination] have no application in a prearrest context. The fact that a citizen has a constitutional right to remain silent when he is questioned has no bearing on the probative significance of his silence before he has any contact with the police. We need not hold that every citizen has a duty to report every infraction of the law that he witnesses in order to justify the drawing of a reasonable inference from silence in a situation in which the ordinary citizen would normally speak out. When a citizen is under no official compulsion whatever, either to speak or to remain silent, I see no reason why his voluntary decision to do one or the other should raise any issue under the Fifth Amendment." 447 U.S. at 243-44 (Stevens, J., concurring).

This court applied *Jenkins* in *State v. Massey*, 247 Kan. 79, 795 P.2d 344 (1990). In *Massey*, the prosecutor asked the defendant on cross-examination in his trial for first-degree murder questions

regarding the defendant's contact with the police before he was arrested or read his *Miranda* rights. This court rejected Massey's assertion that this was a *Doyle* violation, citing *Jenkins* and explaining:

"In the case at bar, the prosecutor attempted to impeach Massey's credibility by asking him if he remembered making certain statements to the police regarding his *Miranda* warnings. Massey's statement was made prior to arrest and therefore prior to any *Miranda* warnings. We find no constitutional violation in the prosecutor's actions. *Doyle* and its progeny did not provide unlimited protection to the criminal defendant who testifies in his own behalf; rather, they stand for the principle that a defendant's silence *induced by government action* cannot be used to impeach his credibility. [Citations omitted.] Massey has attempted to extend the *Doyle* rule to a situation where no government action has induced silence . . . . We find no error." 247 Kan. at 82.

Finally, it is important to note that consistent with the decisions in *Doyle* and its Kansas progeny, this court continues to hold that a prosecutor may impeach a defendant's trial testimony through use of a prior inconsistent statement given by the defendant after he or she was provided *Miranda* warnings. This question arose in the context of *State v. Falke*, 237 Kan. 668, 703 P.2d 1362 (1985), *disapproved on other grounds State v. Walker*, 252 Kan. 279, 297-98, 845 P.2d 1 (1993) (disapproving of language used in *Falke* with regard to instructions on voluntary intoxication), where this court reviewed the murder and kidnapping convictions of the codefendants Falke and White.

During cross-examination, White's defense counsel asked the investigating detective to read from the interrogating police officer's report. The report indicated that White told the interrogating officer at the time of arrest that White did not remember what happened when the crime took place because he was intoxicated. White later testified on his own behalf, explaining in detail the events surrounding the murder, but claiming that he was not involved in the murder but was merely present. White made no indication that he was unable to remember what happened.

The prosecutor asked White on cross-examination why he had not told the police this story when he first talked with them; White replied that he was "scared." 237 Kan. at 681. The defense counsel

objected, arguing that the prosecutor had impermissibly commented on White's postarrest silence.

The *Falke* court examined the *Doyle* and *Mims* decisions but concluded that the rule in those cases was inapplicable to the facts before it. The court reasoned:

"The *Doyle* rule does not apply to the situation presented in the case at bar for two reasons. First, the defendant was not silent. *He made a statement* to the police that he was too drunk to remember what had happened. Stating that he couldn't remember is clearly not the same as being silent. Therefore, when the defendant made a different statement at trial—he testified in detail to the events, thus indicating that he remembered what happened—the prosecutor could properly impeach him with his prior inconsistent statement. K.S.A. 60-422(b). (Emphasis added.)

"The second reason *Doyle* does not apply is that the defendant originally introduced the statements which he later objected to when the prosecutor sought to use them to impeach the defendant. The defendant may not invite error and then complain of that error on appeal. [Citation omitted.]" 237 Kan. at 682.

For these reasons, the *Falke* court found that "[t]he defendant's argument that he was denied due process is wholly without merit." 237 Kan. at 682.

We have set forth the above analysis concerning *Doyle* in order that we may properly address the specific prosecutorial misconduct allegations of the defendant. The defendant argues that the holdings of these cases illustrate that the prosecutor's conduct in the instant case violated the *Doyle* standard by impermissibly using the defendant's postarrest silence to impeach his later testimony at trial. In particular, the defendant likens his case to *Clark*, where this court held that silence as to matters not discussed with the police cannot be used to impeach a defendant's alibi defense at trial. See 223 Kan. at 85-89.

*Defendant's Silence or Lack Thereof*

There is conflict in this case as to how much the defendant said during his original interview with the police. According to the testimony of Independence Police Detective Harry E. Smith and KBI Special Agent Robert Beckham, they met with the defendant after they received word that the defendant's DNA profile in CODIS matched that found in the blood samples from Davidson's murder

scene in order to ask him questions and obtain another DNA sample. They read him his *Miranda* rights, and he indicated that "he understood his rights [and] was willing to talk" with them. Detective Smith, who was in charge of the investigation, testified as to the initial interview of the defendant:

"Q. [Prosecutor:] . . . So you went to talk to him?
"A. [Smith:] Yes, sir.
"Q. Tell us about that conversation.
"A. At that point we met with the Defendant, advised him of his *Miranda* rights. He indicated that he understood his rights, was willing to talk with us. We asked him if he knew Tina Davidson [victim]. *He stated he did not know her.* I explained to him that she used to work at [Automotive Controls Corporation], that she had been murdered in her home back in 1995.

    *"He stated he didn't know her; he never knew her. I asked him if he had ever been at the residence at 721 South Fourth. He said he had never been to that residence."* (Emphasis added.)

The above description was corroborated by the testimony of KBI Special Agent Beckham, who had worked on the case:

"Q. [Prosecutor:] Could you tell us about that conversation?
"A. [Beckham:] We told him why we were there, identified who we were, told him why we were there. *Asked him if he knew Tina Davidson, which he said, No.*

    *"We asked him if he had ever been to her house, and he said, No, he didn't know Tina Davidson, had never been around her, never been at her home.*

    "He was shown a picture that Detective Smith had of Tina Davidson. Mr. Hernandez looked at that picture and said that—Mr. Hernandez looked at it and said that he didn't know her.

    "I then asked him if he had ever cut Ms. Davidson with a knife on purpose, in self-defense, or even by accident, and he said, No. He had never been around her." (Emphasis added.)

Trial defense counsel did not cross-examine either officer regarding his account of the interrogation, nor did counsel object in any way to either officer's testimony regarding the meeting. However, the defendant contradicted the officers' account in his direct testimony.

The defendant acknowledged that he met with the officers and that they showed him a picture of the victim, but he stated that when asked if he knew the person in the picture he said, "No . . . [b]ecause it didn't look like her." The defendant claimed that

this was the only question he answered. He described the remainder of the interview as follows:

"Q. [Defense Counsel:] And then what?
"A. [Hernandez:] Then they said her name is Tina Davidson and she was murdered, and we believe—he said, I believe that you might have been protecting her.
"Q. Been what?
"A. Protecting her.
"Q. Protecting her. Then what did you say?
"A. I just sat there. I sat there and I looked at him, and I didn't say nothing. I was just—I was seeing what he was going to say.
"Q. And this conversation's taking place, roughly, seven-and-a-half or eight years after this happened, right?
"A. Yeah.
"Q. So you don't say anything?
"A. Yeah.
"Q. What happens next?
"A. He changes.
"Q. What do you mean he changes?
"A. He just—he rolls up in his chair between my legs and he's like—he gets up in my face and he's telling me that she was promiscuous, that she was a tease, and that she was with a lot of guys, and we know that she probably was with you, and I just—I didn't say nothing. He was—he was—like hitting my leg while he was telling me.
"Q. So you didn't say anything?
"A. No, I didn't say nothing.
"Q. Did it just end, the conversation just end?
"A. Well, then he said we're going to take a DNA sample.
"Q. And then did you let them?
"A. Yeah."

In addition, the following exchange took place between the prosecutor and the defendant on cross-examination:

"Q. You talked to the police prior to this trial on two separate occasions, did you not?
"A. Yes, sir.
"Q. And they asked you about Tina Davidson, true?
"A. Yes, sir.
"Q. They asked you if you knew her and you told them no, didn't you?
"A. I didn't say nothing, sir.
"Q. So you didn't tell them that you didn't know her?
"A. I said—when they showed me the picture, I said I didn't know who it was.
"Q. And that would—was that true?

"A. When I seen the picture, yeah."

The differences between the defendant's account of the interview and that of the officers complicates our analysis under *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). As we have discussed previously, *Doyle* does not prevent a prosecutor from impeaching a defendant's testimony by way of a prior inconsistent statement. See *Falke*, 237 Kan. at 682. In that case, the court explained that

"the defendant was not silent. He made a statement to the police that he was too drunk to remember what had happened. Stating that he couldn't remember is clearly not the same as being silent. Therefore, when the defendant made a *different statement* at trial—he testified in detail to the events, thus indicating that he remembered what happened—the prosecutor *could properly impeach him with his prior inconsistent statement.* K.S.A. 60-422(b)." (Emphasis added.) 237 Kan. at 682.

With this conflict in mind, our discussion now turns to the respective comments made by the prosecutor during the defendant's cross-examination and during closing argument.

*Did the State impermissibly use the defendant's postarrest silence to impeach the credibility of his testimony in violation of Doyle?*

*Cross-Examination*

The prosecutor began his cross-examination of the defendant with a discussion regarding his first interview with Detective Smith and Agent Beckham. After discussing the defendant's failure to recognize Davidson's picture, the prosecutor continued:

"Q. Okay. Did you know who Tina Davidson was?
"A. [Hernandez:] When they said her name.
"Q. You didn't tell them that, did you?
"A. I didn't say nothing.
"Q. And you kept silent this whole—*for nine years, up until today*—
"A. No.
"Q. —about the story [referring to defendant's account of the events preceding Davidson's murder]?" (Emphasis added.)

The defendant argues that the prosecutor's reference to the fact that his silence extended "from nine years, up until today" includes his postarrest silence and thus violates his rights under *Doyle*.

While it is true that this comment necessarily includes the period that the defendant was charged with Davidson's murder and after he had been advised of his right to remain silent, it also includes the 7½ years prior to his arrest for that murder. The *Jenkins* Court held that "impeachment by use of prearrest silence does not violate the Fourteenth Amendment." 447 U.S. at 240. Thus, it is difficult to say definitively whether this comment can be interpreted in such a way that the prosecutor was impermissibly commenting on the defendant's silence following his arrest.

A more plausible interpretation of this comment concerning the defendant's 9 years of silence, which was made in the context of the discussion regarding the defendant's interview with Detective Smith and Agent Beckham, is that the prosecutor impliedly said, "And you kept silent this whole—for nine years up until today [including and emphasizing the silence during the interview with the officials]." Had the defendant been completely silent in his interview, a *Doyle* violation would have occurred. However, the officers both testified that the defendant told them, after receiving his *Miranda* warnings, that he did not know Davidson and had never been to her home. These statements to the officers were directly in conflict with the defendant's testimony at trial that he knew who Davidson was during the interview after the officers had said her name. Thus, the prosecutor's questions may be interpreted as an attempt to impeach the defendant's trial testimony by way of his prior inconsistent statements to the officers, which this court has held admissible under *Falke*. See 237 Kan. at 682. Moreover, the prosecutor's question did not place any emphasis on the defendant's postarrest silence and, although the question encompassed time after the defendant's arrest, the primary purpose of the question was impeachment of the defendant's statements to the officers. The question therefore does not rise to the level of impermissible impeachment, a constitutional violation decried by *Doyle* and the related decisions of this court.

The cross-examination continued with a discussion of why the defendant did not go to the police with his account after he found out that Davidson was murdered. It is noted that the defendant

testified that he was made aware of the fact that Davidson was murdered 2 weeks after the event.

"Q. [Prosecutor:] Now, Mr. Hernandez, you didn't go to the police. Why is that?

. . . .

"Q. . . . Why is that?

"A. I was scared.

"Q. Okay. Well, we're talking about nine years, sir. Nine years all the way till today. You were charged with murder for a year and a half, haven't you been, prior to today?

"A. (Nodding.)"

At this point, defense counsel objected, claiming that the prosecutor was questioning the defendant on information that concerned his right to remain silent. After a bench conference outside the hearing of the jury and the defendant, the court ruled that the prosecutor could ask the defendant "about anything that . . . he did prior to the time he was charged." The cross-examination continued with the following exchange:

"Q. [Prosecutor:] Prior to you being charged with murder, did you tell the police this story?

"A. [Hernandez:] No.

"Q. Did you tell the police this story when they gave you several opportunities to do it?

. . . .

"A. You know, they charged me, so why would I say anything?

"Q. . . . Did you tell them this story?

"A. I just said—

. . . .

"Q. Did you tell them this story?

"A. No."

The defense counsel was correct in his objection that the prosecutor's original statement that the defendant had been charged with murder for a year and a half prior to his trial was an impermissible use of the defendant's postarrest silence; however, this potential error was corrected by the court's order that the prosecutor only refer to the defendant's statements prior to the time he was charged. See *State v. Mims*, 220 Kan. 726, 731, 556 P.2d 387 (1976). Furthermore, under *Jenkins*, it is permissible for a prosecutor to impeach a defendant's trial testimony by his prearrest si-

lence. Thus, the prosecutor's rephrased question—*"Prior to you being charged with murder*, did you tell the police this story?"*—did not constitute a *Doyle* violation.

The prosecutor's later question regarding why the defendant failed to provide his exculpatory account to the officers during the interview does implicate *Doyle* because the interview took place after he received his *Miranda* rights. See *Doyle*, 426 U.S. at 619. The determinative question as to whether this line of questioning violated the defendant's constitutional rights is whether the discussion centered on what was *not* said during the interview (the defendant's right to remain silent) or what *was* said but now called into question (impeachment by way of prior inconsistent statements). While the prosecutor made no mention of the defendant's statements to the officers, reference to these statements occurred only slightly before this exchange. According to the officers' account of their interview with the defendant, the defendant denied knowing the victim or ever being in her house, but at trial the defendant admitted knowing her and being in her house on the night she was murdered. While the above exchange presents a closer question since the prosecutor's comments did not specifically refer to the officers' testimony regarding the defendant's statements in his initial interview, we conclude that the prosecutor's questions amounted to proper impeachment of his trial testimony based upon what the defendant said to the officers, not upon his trial account of what occurred. Therefore, these statements did not violate the defendant's rights under *Doyle*.

Later in the cross-examination, after the defendant indicated during his testimony on both direct and cross-examination that he would be willing to help the police find the man who he claimed attacked both him and Davidson the night of the murder, the prosecution asked, "Did you ever go to the police and tell them, Hey, I can pick somebody out of a lineup?" The defendant answered, "No." Similar to the comments we have previously discussed, this statement is ambiguous as to whether the prosecutor was referring to the defendant's prearrest or postarrest silence. Because the prosecutor did not explicitly refer to the postarrest silence and did not give the jury any reason to believe he was referencing that period,

this comment again does not rise to the level of a constitutional violation.

The prosecutor closed his cross-examination with a discussion of the fact that the defendant claimed in his testimony to know that someone else had committed Davidson's murder and, yet, he had not said anything to the police about it even after he had been charged with that crime:

"Q. Mr. Hernandez, you're the one charged with Tina Davidson's murder, aren't you, sir?
"A. Yes.
"Q. You're the one?
"A. (Nodding.)
"Q. And you've known that for a year-and-a-half, haven't you?
"A. Yes."

In this exchange, the prosecutor refers specifically to the time after the defendant was advised of his right to remain silent and charged with Davidson's murder. The implication of these questions in the context of the cross-examination is that the defendant should have gone to the police with his story, if not before he was charged, definitely after he knew he would stand for trial on the offense. While this is an inference at best, it is similar, although to a much lesser degree, to the language used in *State v. Heath*, 222 Kan. 50, 52-53, 563 P.2d 418 (1977), where this court found a violation when the prosecutor made reference to Heath's failure to provide the alibi in the 4 months since he was charged until at the trial during closing argument. This court explained in *State v. Clark*, 223 Kan. 83, 89, 574 P.2d 174 (1977), that an accused "is under no duty to volunteer his exculpatory story." Thus, this final line of questioning by the prosecutor by implication impermissibly infringed upon the defendant's constitutional privilege to remain silent under *Doyle* and *Mims*.

### Closing Argument

The prosecutor also made a number of statements during closing argument that the defendant claims violated his constitutional rights. These are listed below and treated together, as the alleged violations are similar to those discussed above.

At one point, the prosecutor referred to the defendant's exculpatory story and argued:

"And he tells you for the first time—*for the first time he's ever said anything in nine years since her murder.* Somebody else did it.

"He didn't tell Agent Beckham that *when he was asked about it a year and a half earlier.* He didn't tell Detective Smith that *when he was asked about it a year and a half earlier,* but he tells you today for the first time. He watched somebody else." (Emphasis added.)

The prosecutor later asserted in a similar vein:

"He's the Defendant. *He's been charged for a year and a half.* He sat there and heard all of the evidence in this case and isn't it interesting that his story accounts for the evidence the State has put before it, before you. Isn't that interesting?" (Emphasis added.)

In addition, he made the following two comments after the defense attorney had given his closing argument:

"Now, bear in mind, the police didn't know that it was his blood at the time and for eight years he never told them. *He never brought forth the story he gave you today for the very first time in nine years since her murder.*"

"The evidence, all of the evidence, points at the Defendant and then find out today—all of it yesterday, when you heard it—points at the Defendant and then all of a sudden we hear after disputing it was his blood, here it was. He was there. We hear that. He was there, in her house, that night.

"But I didn't kill her. Somebody unnamed did. *I didn't tell the police. I told Agent Beckham I didn't know her. I didn't tell Agent Beckham the story, had several opportunities to do so.* But today before you, *charged with murder,* he gets on the stand and tells you his story." (Emphasis added.)

These comments clearly refer to both the defendant's pre and postarrest silence. Under *Jenkins v. Anderson,* 447 U.S. 231, 65 L. Ed. 2d 86, 100 S. Ct. 2124 (1980), and *State v. Massey,* 247 Kan 79, 795 P.2d 344 (1990), reference to prearrest silence is permissible to impeach a defendant's credibility. While the prosecutor's comments to the effect that the defendant had not told the story he provided at trial in the 9 years since Davidson's murder necessarily included the year and a half that he was charged with that murder, the emphasis appears to have been on the several years prior to his arrest that he did not volunteer his story, the discussion of which was constitutionally permissible. Furthermore, under

*State v. Falke,* 237 Kan. 668, 703 P.2d 1362 (1985), a defendant's trial testimony still may be impeached by way of prior inconsistent statements. The prosecutor's statements that the defendant did not provide his story to Detective Smith and Agent Beckham during their interview of the defendant were permissible, as they contrasted the defendant's testimony at trial to the statements he made to the officers a year and a half earlier that he did not know Davidson and had never been to her home.

Nevertheless, a prosecutor may not comment on a defendant's postarrest silence or imply that a defendant had some obligation to reveal his trial testimony to police after being warned of his right to remain silent. There is a clear implication in the prosecutor's comments during closing argument that were the defendant's testimony at trial true, he would have provided his exculpatory story after he was charged. The prosecutor stated that "[h]e's the Defendant. *He's been charged for a year and a half.*" (Emphasis added.) Such implications are barred by *Doyle* and by this court's decisions in *Heath,* 222 Kan. at 52-54, and *Clark,* 223 Kan. at 87-89. Thus, we conclude that the excerpts from the prosecutor's closing argument violated *Doyle* and constituted prosecutorial misconduct.

### *Did the prosecutor's comments deny the defendant a fair trial?*

In determining whether a prosecutor's misconduct constitutes plain error, a court considers three factors: "(1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence was so overwhelming that the misconduct was likely to have little weight in the minds of jurors. [Citations omitted.]" *State v. Anthony,* 282 Kan. 201, 207, 145 P.3d 1 (2006). Because the prosecutorial misconduct in the present case involves a violation of the defendant's constitutional rights, the third factor necessarily encompasses our test for constitutional error, as set forth by this court in *State v. Brown,* 280 Kan. 65, 77, 118 P.3d 1273 (2005):

" 'An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. Thus, before an appellate court may declare the error

harmless, it must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial.' [Citation omitted.]"

To determine whether a trial error is harmless error or prejudicial error, each case must be scrutinized and viewed in the light of the trial record as a whole, not on each isolated incident viewed by itself. *State v. Abu-Fakher*, 274 Kan. 584, 613, 56 P.3d 166 (2002). It should first be noted that the impermissible comments not only were few, but also were by no means explicit. Instead, they involve inferences and interpretations but might be similarly interpreted in such a way that no violation occurred. Thus, the prosecutor's conduct in making the comments or questions that we find to have violated the defendant's rights in this case, although misconduct in a pure sense of the word, was not gross and flagrant.

However, we may not interpret the prosecutor's actions as completely innocent. Having been clearly instructed by the trial court of the permissible time frame for questions as well as comments regarding the defendant's silence, the prosecutor nevertheless continued to comment on the fact that the defendant had been charged with Davidson's murder for a year and a half and had not provided his version of the events that occurred until his trial. In this way, the prosecutor's comments and questions, while resting on inferences instead of direct statements, must be characterized as intentional. Thus, ill will on the prosecutor's part may be imputed based upon the prosecutor's intentional actions. See *State v. Zvolanek*, No. 93,448, unpublished Court of Appeals opinion filed October 21, 2005, *rev. denied* 281 Kan. 796 (2006) (stating that "if the prosecutor had continued with *Doyle* violations after being instructed by the court not to do so, ill will could be more easily inferred," citing *State v. Gleason*, 277 Kan. 624, 641, 88 P.3d 218 [2004]).

Nevertheless, when the prosecutor's comments are viewed in the context of the whole trial, the errors were harmless beyond a reasonable doubt. The State's case against the defendant did not turn on the fact that the defendant remained silent after he was charged with the crime. Instead, it was based on a number of pieces of evidence, including the fact that his DNA matched that of the

trail of blood drops found surrounding Davidson's body and leading from her residence, that he provided inconsistent statements to the police officers, and that he had acknowledged his participation in Davidson's murder to his wife, then fiancee, Jessica Hernandez. Jessica testified that the defendant had asked her at one time whether she "knew what a lot of blood smelled like." She stated that he then told her that he had been involved in a murder of a woman in Independence, had driven to the woman's house, and watched as his friend "cut up" the victim. She also explained that the defendant had told her that the case had remained unclosed because the police "didn't have evidence and it just couldn't be solved." This testimony, provided by the defendant's wife, is in sharp contrast to the innocent story provided by the defendant. Moreover, as the previous discussion demonstrates, the prosecutor's comments concerning the fact that the defendant did not come to the police with his story in the 8 years between Davidson's murder and the time he was charged *were* admissible to impeach the credibility of the defendant's testimony under *Jenkins*.

The overwhelming evidence against the defendant demonstrates that this case is notably different from *Heath*, where this court reversed on the basis of *Doyle* violations where "there was no testimony indicating [the defendant's] actual participation in the burglary and theft other than his presence and participation as an aider and abettor." *Heath*, 222 Kan. at 54. Instead, the case is more similar to *Mims*, where we found that the prosecutor's errant comments "constituted harmless error beyond a reasonable doubt in view of the overwhelming evidence of the defendant's guilt disclosed in the record." 220 Kan. at 731.

This court has explained that " '[n]ot every trial error or infirmity which might call for application of an appellate court's supervisory powers correspondingly constitutes a failure to observe the fundamental fairness that is essential to the very concept of justice.' [Citation omitted.]" *State v. Leitner*, 272 Kan. 398, 421, 34 P.3d 42 (2001). Despite the fact that some of the statements made by the prosecutor on cross-examination and in closing argument were attempts by the prosecutor to impermissibly impeach the defendant's testimony through reference to his postarrest silence, the

statements were not gross and flagrant and, based upon the record as a whole, the misconduct was likely to have little weight in the minds of jurors. We conclude beyond a reasonable doubt that the prosecutorial misconduct had little, if any, likelihood of having changed the result of the trial and that such comments did not deny the defendant the right to a fair trial.

## (2) Hearsay Evidence

During the trial, two police officers testified that during their interview with the mother of the defendant, Margaret Hernandez stated that her son knew Davidson from work. While Hernandez' mother was present at the trial, the State did not call her as a witness. However, Hernandez' mother was later called as a witness for the defense, where she testified that she never told the police officers that her son knew the victim.

The State acknowledges that the statement of Hernandez' mother, as described by the two police officers, was hearsay. However, the State argues that the trial court's error in admitting this statement was harmless.

This court has explained that "[e]rrors that do not affirmatively cause prejudice to the substantial rights of the defendant do not require reversal when substantial justice has been done. [Citation omitted.]" *State v. Ackward*, 281 Kan. 2, 23, 128 P.3d 382 (2006). Where, as here, a criminal defendant's confrontation rights are implicated, previous case law cautions that we " 'must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial.' [Citation omitted.]" *Brown*, 280 Kan. at 77.

The State argues that the admission of Hernandez' mother's statement was harmless error for two reasons: (1) she was later called as a witness by the defense and testified that she did not make the statement in question, and (2) that the statement was nearly inconsequential in the context of the entire trial and the evidence against the defendant.

It is true, as the State first argues, that Hernandez' mother was later able to testify regarding her alleged statement to the two police officers. While this is important in our evaluation of the

prejudicial impact of the error, this alone cannot be reason enough that the error was harmless because this court specifically held in *Fisher* that a defendant's confrontation rights are violated when the State does not call a witness, even if that witness may later be called by the defense. See 222 Kan. at 82. This reasoning would be completely undermined if this court were to hold that Hernandez' mother's later testimony rendered the error of admitting the original hearsay statement harmless.

However, the State's second argument is convincing. The hearsay statement that the defendant knew Davidson from work was acknowledged by the defendant in his own trial testimony. The defendant testified that he knew Davidson and gave her a ride home on the night of the incident because her car broke down. He also testified that Davidson invited him into her home. Under these circumstances, the admission of the mother's hearsay statement did not in any way prejudice the defendant. Moreover, the statement did not bear on any element of the offense charged, and the evidence of guilt was overwhelming. The blood on the victim and throughout the victim's house matched the defendant's DNA, and the defendant explained that he was present in Davidson's house the night she was attacked, though he claimed someone else attacked her and he left before the killing took place. As the State argues, the hearsay statement of Hernandez' mother was "inconsequential," and " 'had little, if any, likelihood of having changed the result of the trial.' " *Brown*, 280 Kan. at 77. While the trial court committed error in admitting the statement, we conclude that such error was harmless.

(3)   Gruesome Photographs of the Victim Admitted at Trial

The defendant argues that the trial court erred when it admitted 26 photographs from Davidson's autopsy into evidence because he claims that the photographs were "repetitious, gruesome, and only went to inflame the jury."

" 'The admission of photographs in a homicide case is a matter within the trial court's discretion, and the court's ruling will not be disturbed on appeal absent a showing of abuse of that discretion.' "

*State v. Barksdale*, 266 Kan. 498, 511, 973 P.2d 165 (1999) (quoting *State v. Reed*, 256 Kan. 547, 557, 886 P.2d 854 [1994]).

The defendant's counsel originally raised this argument in the context of a pretrial motion in limine; the motion was renewed at trial. At the hearing on the original motion, the trial court reviewed one-by-one all of the pictures to which the defendant's counsel objected, asking the prosecutor questions regarding the photos' probative value and the testimony that would accompany them at trial. After examining the photographs, the court excluded two pictures, determining that State's Exhibit 40 was repetitive and State's Exhibit 53 lacked probative value. The other photographs were admitted as relevant and not overly repetitive.

The State offered the photographs into evidence at trial in the context of its direct examination of Dr. Cobb, the forensic pathologist who performed the autopsy on Davidson. The majority of the pathologist's testimony concerned explaining the different injuries depicted in the photographs, as well as the cause of those injuries. Dr. Cobb also used a dressed mannequin to demonstrate to the jury her conclusions from the autopsy.

While it is true that the "wholesale admission of similar grotesque and bloody photographs which add nothing new to the state's case" is improper, *State v. Clark*, 218 Kan. 18, 24, 542 P.2d 291 (1975), the general rule is that relevant photographs are admissible. As this court has previously explained:

"Generally, all relevant evidence is admissible. K.S.A. 60-407(f). Relevant evidence is defined as 'evidence having any tendency in reason to prove any material fact.' K.S.A. 60-401(b). . . .

'Photographs depicting the extent, nature, and number of wounds inflicted are generally relevant in a murder case. Photographs which are relevant and material in assisting the jury's understanding of medical testimony are admissible. Specifically, photographs which aid a pathologist in explaining the cause of death are admissible. Photographs used to prove the manner of death and the violent nature of the crime are relevant and admissible.' " *State v. Cavaness*, 278 Kan. 469, 477, 101 P.3d 717 (2004) (quoting *State v. Parker*, 277 Kan. 838, Syl. ¶ 5, 89 P.3d 622 [2004]).

See also *State v. James*, 279 Kan. 354, 357-58, 109 P.3d 1171 (2005) (quoting the above language and finding the photographs in question were relevant and admissible).

The fact that a photograph might be considered gruesome does not mean that it must be excluded. As this court noted in *State v. Green*, 274 Kan. 145, 148, 48 P.3d 1276 (2002), "[g]ruesome crimes result in gruesome photographs." While photographs that are *unduly* gruesome and lack probative value should be excluded, "demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue." *State v. Carr*, 265 Kan. 608, 623, 963 P.2d 421 (1998) (citing *Reed*, 256 Kan. at 557).

Nevertheless, this court has held that "special care should be taken" in considering whether the admission of autopsy photographs was proper in order to prevent the admission of evidence that is "more gruesome than necessary." *Carr*, 265 Kan. at 623. For example, this court held in *State v. Boyd*, 216 Kan. 373, 377-78, 532 P.2d 1064 (1975), it was error to admit the autopsy photographs that unnecessarily showed the effect of the autopsy on the body. The court noted that one photograph, in particular, "show[ed] the body of the deceased cut open from chin to groin and laid out like a disemboweled beef in a packing plant." 216 Kan. at 377. Subsequent cases have likewise held that photographs that overly demonstrate the effect of the autopsy should not be admitted. See *State v. Sherrer*, 259 Kan. 332, 343, 912 P.2d 747 (1996) (stating that "we fail to see the necessity for admitting into evidence repetitious photographs which, in addition to demonstrating the angle of penetration, also showed the effect of the autopsy on the deceased's body"); *State v. Adam*, 257 Kan. 693, 708, 896 P.2d 1022 (1995) (holding it was error to admit photographs that were "strikingly similar to ones disapproved by the court in *State v. Boyd*, 216 Kan. 373").

The mere fact that a photograph was taken at the time of the autopsy does not lead to a presumption that such a photograph shows the effect of the autopsy and, therefore, should be excluded. In *Green*, this court held that eight slides were relevant and admissible, despite the fact they were taken during the autopsy. 274 Kan. at 148. The court explained:

"It is true that [the photographs] were taken at the time of the autopsy, but they are not autopsy photographs, as we frequently use that term to designate photographs of bodies after invasive procedures during autopsy have been performed. Here, the many injuries to the body depicted in the slides are the result of what the victim's killer did to her." 274 Kan. at 148.

The *Green* court further reasoned that even invasive photographs may be admissible, though such photographs are "subject to somewhat stricter tests when they show the injuries to the body inflicted by the autopsy procedure itself." 274 Kan. at 148.

Finally, it should be noted that the sheer number of photographs admitted in a particular instance does not necessitate a finding that the photographs were unduly repetitive. See *State v. Bradford*, 272 Kan. 523, 534-35, 34 P.3d 434 (2001) (no abuse of discretion where trial court admitted 37 autopsy photographs, where the court noted that "[e]ach picture relates to a portion of the State pathologist's testimony and displays particular wounds, blood stain patterns, the original condition of the bodies prior to autopsy, or a combination of these" and "[n]one of the pictures are excessively gruesome, nor do they depict any unnecessarily intrusive autopsy procedures"); *Barksdale*, 266 Kan. at 510-11 (no abuse of discretion where trial court admitted 54 autopsy photographs, where "[a]ll the photographs [were] relevant in showing the injuries to the victims as well as the crime scenes where the bodies were located" and none show the "intervention by a pathologist" through autopsy procedures).

Reviewing the photographs alongside Dr. Cobb's testimony in this case, the district court did not abuse its discretion in admitting them. While it is true, as the defendant argues in his brief, that the photographs all depicted Davidson's injuries and all were taken during the course of the autopsy, they were not truly repetitive. Each photograph highlighted a different injury or a different aspect of an injury that the pathologist found relevant to Davidson's cause and manner of death. While the photographs may seem somewhat repetitive if viewed in a vacuum, Dr. Cobb described the differences.

For example, the defendant claims that Exhibits 35 through 39 were unduly repetitive because they show "the same extreme thumb wound [on Davidson's left hand] . . . from other angles."

However, Dr. Cobb's testimony regarding these five photographs illustrates that they respectively depict (1) an "incised wound" on the thumb and bruising over the second knuckle and a portion of the back side of the hand; (2) slices across the flesh of Davidson's fingers and the depth of her thumb slice; and (3) bruising under Davidson's fingernails, as well as the fact that this hand was underneath her when she lay on the kitchen floor. Moreover, Dr. Cobb described these wounds as "defense wounds" and explained how Davidson would have received each of the injuries as she tried to get away from her attacker.

The fact that photographs depict the same injuries more than once does not render such photographs unduly repetitive if they depict different aspects of those injuries. See *Bradford*, 272 Kan. at 534-35. This is not, as the defendant argues, the "wholesale admission of similar grotesque and bloody photographs which add nothing new to the state's case," as was the case in *Clark*, 218 Kan. at 24.

The defendant also argues that the photographs lacked probative value because the defense did not dispute the cause of Davidson's death. However, this court rejected a similar argument in *State v. Gholston*, 272 Kan. 601, 35 P.3d 868 (2001) *cert. denied* 536 U.S. 963 (2002). There, the court explained:

"Even where the defendant concedes the cause of death, the prosecutor has the burden to prove all the elements of the crime charged and photographs to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant and admissible. [Citation omitted.]" 272 Kan. at 613.

Moreover, the State asserts that the photographs were not only produced in order to show cause of death, but also to illustrate the violent nature and struggle associated with the crime. According to the State, this helped to illustrate how Davidson's attacker would have suffered injuries as well, therefore explaining the presence of the defendant's DNA at the crime scene. The State claims that such evidence was therefore critical to its case. Without deciding whether these photographs were truly critical, they were nevertheless relevant for the reasons described by the State, in addition to proving the nature and extent of Davidson's injuries.

Finally, it should be noted that although these photographs were all taken during the autopsy, none of the photographs showed any incisions or other effects of the autopsy on Davidson's body. Thus, the photographs in this case are quite different from those reviewed in *Boyd*, *Sherrer*, and *Adam*. Rather, the photographs in this case might be likened to the slides admitted in *Green*. As this court explained in *Green*:

"This was an incredibly violent and gruesome homicide. At least 11 massive blows to the head were inflicted and did horrific damage to the face and skull. Additionally, near decapitation resulted from multiple sawing motions from a sharp object. Gruesome crimes result in gruesome photographs. Here, the trial court reviewed the proposed photographic exhibits, heard the medical examiner explain how her intended use thereof would assist in her testimony as to injuries inflicted and cause of death, and approved eight of the photographic slides for admission. Defendant does not even come close to establishing that the admission of the complained-of photographic evidence constituted an abuse of judicial discretion." 274 Kan. at 148.

While this case involves the admission of 26—not 8—photographs, each one illustrates some different element of the case or aspect of Davidson's injuries. The photographs were relevant to proving the nature and extent of Davidson's injuries, the length of time and physical persistence it may have taken her attacker to inflict those injuries, and the defensive nature of some of the wounds. They also helped to explain why the defendant's blood was found throughout Davidson's house and front yard. The fact that the photographs may be considered gruesome does not change the fact that Davidson's injuries were horribly gruesome. We conclude that the trial court did not abuse its discretion in admitting the photographs into evidence.

(4)    Constitutionality of the Kansas Hard 40 Sentencing Scheme

The defendant next argues that Kansas' hard 40 sentencing scheme is unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), because it allows a sentencing judge (not a jury) to increase time that an offender is imprisoned without being eligible for parole by making findings of

fact by a preponderance of the evidence (not beyond a reasonable doubt).

The constitutionality of a sentencing statute is a question of law over which this court has unlimited review. *State v. Engelhardt,* 280 Kan. 113, 142, 119 P.3d 1148 (2005).

This court has repeatedly upheld the constitutionality of the hard 40 sentencing scheme after *Apprendi. State v. Conley,* 270 Kan. 18, 35, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001); see *James,* 279 Kan. at 358 (hard 50 case); *State v. Washington,* 275 Kan. 644, 680, 68 P.3d 134 (2003) (hard 50 case). The defendant criticizes *Conley's* reliance on *McMillan v. Pennsylvania,* 477 U.S. 79, 91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986), and asserts that the United States Supreme Court is likely to revisit *McMillan* in light of *Apprendi* and *Jones v. United States,* 526 U.S. 227, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999). The defendant cites no authority for this proposition or any recent Kansas or United States Supreme Court decisions that would indicate that the prior opinions of this court are no longer controlling. *Cf. Ring v. Arizona,* 536 U.S. 584, 589, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002); *State v. Reed,* 282 Kan. 272, 282, 144 P.3d 677 (2006) (hard 50 case). We hold that the Kansas hard 40 sentencing scheme is constitutional under *Apprendi* and the Kansas Constitution Bill of Rights.

(5)   Sufficiency of Evidence to Uphold Hard 40 Sentence

The defendant last asserts that the court's imposition of his hard 40 sentence, based on its determination at sentencing that Davidson's murder was committed in an "especially heinous, atrocious, and cruel manner," was not supported by the record in this case. However, when viewed in the light most favorable to the prosecution, there existed ample evidence in this case to support the court's conclusion that the murder was committed in a particularly cruel manner.

Where the sufficiency of the evidence is challenged for establishing the existence of an aggravating circumstance in a hard 40 sentencing proceeding, the standard of review is " 'whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the exis-

tence of the aggravating circumstance by a preponderance of the evidence.' [Citations omitted.]" *State v. Boldridge*, 274 Kan. 795, 808, 57 P.3d 8 (2002), *cert. denied* 538 U.S. 950 (2003) (hard 50 case).

K.S.A. 2006 Supp. 21-4635 allows a court to impose a hard 40 sentence when the court finds that "one or more of the aggravating circumstances enumerated in K.S.A. 21-4636 and amendments thereto exist" and the aggravating factors are not outweighed by any mitigating circumstances. K.S.A. 2006 Supp. 21-4635(d). Among the aggravating factors listed in K.S.A. 2006 Supp. 21-4636 is whether "[t]he defendant committed the crime in an especially heinous, atrocious or cruel manner." K.S.A. 2006 Supp. 21-4636(f). The statute describes this factor as follows:

"A finding that the victim was aware of such victim's fate or had conscious pain and suffering as a result of the physical trauma that resulted in the victim's death is not necessary to find that the manner in which the defendant killed the victim was especially heinous, atrocious or cruel. In making a determination that the crime was committed in an especially heinous, atrocious or cruel manner, any of the following conduct by the defendant may be considered sufficient:

. . . .

(3) infliction of mental anguish or physical abuse before the victim's death;

(4) torture of the victim;

(5) continuous acts of violence begun before or continuing after the killing;

(6) desecration of the victim's body in a manner indicating a particular depravity of mind, either during or following the killing; or

(7) any other conduct in the opinion of the court that is especially heinous, atrocious or cruel." K.S.A. 2006 Supp. 21-4636(f).

This court described the circumstances under which a hard 40 sentence should be imposed in *State v. Spry*, 266 Kan. 523, 531, 973 P.2d 783 (1999):

"Historically, murder has been the cardinal offense against society. All murders are heinous, atrocious, and cruel. [Citation omitted.] However, exceptional circumstances must exist before a murder can be classified as 'especially heinous, atrocious or cruel.' We have previously said: 'The hard 40 sentence should be reserved for special cases . . . . Otherwise, the legislature would have mandated the hard 40 sentence in all first-degree murder cases.' *State v. Willis*, 254 Kan. 119, 129, 864 P.2d 1198 (1993). 'A crime is committed in an especially heinous, atrocious, or cruel manner when the perpetrator *inflicts serious mental anguish or serious physical abuse before the victim's death. Mental anguish includes a*

*victim's uncertainty as to [his] or [her] ultimate fate.'* (Emphasis added.) 254 Kan. 119, Syl. ¶ 4."

The trial court below relied on its conclusion that Davidson was murdered in "an especially heinous, atrocious, and cruel manner" when imposing the defendant's hard 40 sentence. As the judge explained at sentencing:

"It's the Court's finding that aggravating factors exist that cause this crime to be committed in an especially heinous, atrocious, and cruel manner by the infliction of mental anguish or physical abuse before the victim's death and that the desecration of the victim's body before the killing indicates a particular depravity of mind and that—that all of the conduct surrounding this incident causes me to find and reach an opinion by a preponderance of the evidence that the crime was especially heinous, atrocious, and cruel.

"The facts that—that I find that support these aggravating circumstances are based upon the evidence presented, the testimony at the trial. I'm convinced that Tina Davidson fought for her life. It's established by multiple blunt trauma injuries, multiple cuts from the knife on both of her hands. These were defensive injuries.

"I find that those occurred while she was still alive. If the cuts were made after she had died on her hands—it is especially cruel and brutal and depraved. I'd rather think they were made as defensive injuries while she was alive, attempting to fight off Mr. Hernandez.

"Multiple knife and stab wounds in back, chest, and arm convince me that Tina Davidson was in extreme fear during the attack by Jeremy Hernandez upon her person, and I think this terror lasted, unfortunately, over a time period which, in my opinion, would cause indescribable mental anguish as well as conscious physical pain.

"All of those stab wounds, cuts, blunt trauma injury, defensive wounds were inflicted by Mr. Hernandez on Tina Davidson before her throat was cut and slashed 16 times. Before she died.

"The wounds on her throat are, I believe, especially heinous and cruel because it was not once or twice but 16 times, wounds deep into her body, almost to her spinal cord.

"Other facts that I find supporting my decision that Mr. Hernandez committed acts of violence before her death is that—you know, one of the witnesses, I think it was Dr. Cobb, stated that her wounds represented an overkill.

"I think Tina Davidson, prior to her death, at the hands of Jeremy Hernandez suffered terror, extreme mental anguish, and gross abuse physically by Mr. Hernandez before her death. This brutal attack, I find, was designed to inflict a high degree of pain and was, therefore, cruel."

The conclusions of the trial court, as described above, are supported by the record.

Dr. Mears, the coroner who examined the body at the crime scene, testified at trial that he observed a number of defensive wounds, demonstrating that Davidson had attempted to fight off the attack and prevent her attacker from stabbing or slashing her. He further explained that her neck wounds were particularly violent, noting that "[t]his is a tremendously bad way to die." He later stated that Davidson's defensive wounds showed that she was conscious and struggling as her throat was being slashed.

This testimony coincided with the testimony of Dr. Cobb, the pathologist who performed Davidson's autopsy. Dr. Cobb explained at length the nature and extent of Davidson's defensive injuries, referring to the photographs described previously. In particular, Dr. Cobb testified that the cuts on Davidson's fingers and hands were caused when she tried to grab or push away her attacker's knife when she was being held from behind. In addition, Dr. Cobb stated that Davidson received all of the wounds to her chest and back, as well as the blunt trauma which caused her bruises, prior to her death. The pathologist further explained that Davidson received 16 cuts across her throat, the combination of which sliced all the way through her windpipe, esophagus, and carotid arteries; Dr. Cobb described the multitude of wounds that Davidson received as "overkill."

The defendant argues that the court erred when it imposed the hard 40 sentence in this case. He acknowledges that Davidson's death was violent, but he argues that "all murders are violent. To elevate this murder to a Hard 40 sentence, the state must show something more than that this murder was violent and brutal." To support this conclusion, he cites *State v. Follin*, 263 Kan. 28, 947 P.2d 8 (1997), and *State v. Cook*, 259 Kan. 370, 913 P.2d 97 (1996), where this court held in both cases that there was insufficient evidence to support a hard 40 sentence. However, these cases are distinguishable.

In *Follin*, the defendant killed his two daughters by stabbing each of them three times in the chest. However, this court noted that since Follin had opened the girls' blouses to find the exact

spot to stab them, this was evidence that "Follin's conduct is more susceptible to being interpreted as the perpetrator's avoiding infliction of serious anguish or physical abuse before the victim's death." 263 Kan. at 51. In *Cook*, the defendant shot the victim once in the chest and once in the back. This court concluded that these two shots alone were not sufficient to support a hard 40 sentence, particularly in light of "[t]he general rule in Kansas is that 'deaths caused by shooting do not result in a finding that the manner in which they were conducted was heinous, atrocious, or cruel.'" 259 Kan. at 401 (quoting *State v. Alford*, 257 Kan. 830, 838, 896 P.2d 1059 [1995]).

The defendant asserts that these cases stand for the proposition that the imposition of multiple wounds does not automatically support the imposition of a hard 40 sentence. Moreover, the defendant argues, the fact that a victim is cognizant that he or she is being attacked is not sufficient to impose the harsher sentence. See *Spry*, 266 Kan. at 535 (citing *Follin* and *Cook*).

While it is true that neither the number of wounds nor the awareness of the victim necessarily supports the imposition of a hard 40 sentence, this court emphasized in *Spry* that "[t]he victim's physical and mental condition before death is critical. There is no argument or even discussion here that [the victim] suffered physical or mental anguish before death." 266 Kan. at 534. In this way, *Spry*, *Follin*, and *Cook* are all distinguishable from the current case. Not only did Davidson receive multiple stab wounds and blunt trauma from her attacker, but the evidence at trial demonstrated that she was aware of these injuries and was struggling violently to get away and prevent further injuries. The trial court concluded that Davidson was in "extreme fear" during the attack, and this conclusion is supported by the record. Thus, the trial court did not err in imposing the hard 40 sentence.

Affirmed.