No. 115,184

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ZIAD KHALIL-ALSALAAMI,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

SYLLABUS BY THE COURT

1.

A defendant's constitutional right under the United States Constitution to be present during criminal proceedings stems from the Sixth Amendment right to confront witnesses and the due process right to attend critical stages of a criminal proceeding.

2.

Being present at trial involves more than physical attendance; it requires that the defendant be able to understand what is happening so that he or she can participate in his or her defense.

3.

The right to be present includes a right to have trial proceedings translated into a language that the defendant understands.

4.

A defendant facing confinement or a penal sanction whose primary language is one other than English has a statutory right to an interpreter at trial. K.S.A. 75-4351(b).

1

5.

The United States Constitution does not require an interpreter be provided in all cases in which a defendant's primary language is not English. Instead, courts have discretion in deciding whether to appoint an interpreter, considering, among other factors, the defendant's knowledge of English and the complexity of the proceedings.

6.

Waiver of an interpreter is not a decision for defense counsel or the court to make. It is the defendant's decision, after the court explains to the defendant the nature and effect of a waiver.

Appeal from Riley District Court; JOHN F. BOSCH, judge. Opinion filed June 16, 2017. Reversed and remanded.

*Richard Ney* and *David L. Miller*, of Ney, Adams & Miller, of Wichita, for appellant.

*Bethany C. Fields*, deputy county attorney, *Barry K. Disney*, senior deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., BUSER and POWELL, JJ.

ARNOLD-BURGER, C.J.: Ziad Khalil-Alsalaami (Ziad) was convicted of two counts of aggravated criminal sodomy. His conviction was affirmed by this court in 2012 and the Kansas Supreme Court denied review of that decision. In 2014, Ziad filed a K.S.A. 60-1507 motion alleging ineffective assistance of counsel at trial and on direct appeal. After a full hearing, the district court denied the motion. Ziad now appeals.

Because we find that Ziad's counsel was ineffective at both trial and on appeal, we reverse his convictions and remand this case for further proceedings.

FACTUAL AND PROCEDURAL HISTORY

Following a jury trial, Ziad was convicted of two counts of aggravated criminal sodomy. He appealed the jury verdict and his sentence to this court in *State v. Khalil-Alsalaami*, No. 106,610, 2012 WL 5869581 (Kan. App. 2012), *rev. denied* 297 Kan. 1252 (2013). In its opinion affirming the district court, this court set forth the following relevant facts:

"On May 1, 2010, C.J., a 13-year-old girl, attended a party in Manhattan hosted by [Ziad], who was 28 years old at the time. Several attendees testified that C.J. appeared to be in her late teens. [Ziad] was in the United States as a permanent resident after serving as an interpreter for the United States military forces in Iraq.

"C.J. traveled to the party from Ft. Riley with three men of unknown ages. According to C.J. and two of these men, a discussion arose whether C.J. would have sex with [Ziad] for money. C.J. testified that she refused the suggestion, but one of the men testified that she agreed to the idea.

"In C.J.'s version of events, one of the men asked if she was tired and led her to [Ziad's] bedroom to lie down. This man [John Esquivel] testified that C.J. went to the bedroom intending to have sex in return for money. Regardless, C.J. and the two men agreed she was in the bedroom with [Ziad].

"C.J. testified that [Ziad] pushed her onto the bed, undressed her, and forced her to engage in oral sodomy, sexual intercourse, and anal sodomy. [Ziad] admitted to oral and anal sodomy during a police interview, but he claimed that he thought C.J. was 18 or 19 years old and had consented to the sexual acts. [Ziad] denied sexual intercourse or agreeing to pay money for the sex acts.

"At trial, [Ziad] changed his account of the incident, specifically denying that he entered the bedroom or had sexual relations with C.J. He claimed he said otherwise in the police interview because the officer repeatedly suggested that sex had occurred. [Ziad] did not assert coercion, however, and the State produced his earlier stipulation that 'his

3

statements to law enforcement were knowing and voluntarily given and he was not under any compulsion and no threats or promises were made to him.'" 2012 WL 5869581, at *1.

This appeal arises from the district court's denial, after a full hearing, of a K.S.A. 60-1507 motion Ziad filed alleging that his attorney, Barry Clark, provided him ineffective assistance of counsel at trial and on direct appeal.

Additional facts will be discussed below as relevant.

STANDARD OF REVIEW

In a K.S.A. 60-1507 motion, Ziad alleged that he was denied his right to a fair trial based on numerous instances of attorney error at trial and that, as a result, he received ineffective assistance of counsel on direct appeal. The district court denied Ziad's motion after a hearing, finding that his allegations of error lacked merit. Ziad appeals that finding.

Claims alleging ineffective assistance of counsel present mixed questions of fact and law. Consequently, on appeal, this court reviews the underlying factual findings for support by substantial competent evidence and the legal conclusions de novo. *State v. Bowen*, 299 Kan. 339, 343, 323 P.3d 853 (2014).

Judicial scrutiny of counsel's performance when assessing a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish that (1) the performance of defense

4

counsel was deficient under the totality of the circumstances, and (2) the defendant was prejudiced by counsel's error. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014). To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Miller v. State*, 298 Kan. 921, 934, 318 P.3d 155 (2014).

## COUNSEL'S TRIAL STRATEGY

In reviewing the totality of the circumstances in this case it is important to first consider counsel's overall trial strategy. Although a strategic decision made by counsel after full investigation of the relevant law and facts is virtually unchallengeable,

> "'[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, *counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.* In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.' (Emphasis added.)" *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013) (citing *Strickland v. Washington*, 466 U.S. 668, 690-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984]).

Barry Clark, Ziad's lead trial counsel, testified at the hearing that he believed that the two pillars of the case were the DNA evidence recovered from the victim and the statement Ziad gave to police. We agree. As to the DNA evidence, Ziad's defense was that he had sex in the bed a few hours earlier with another woman and the DNA that was recovered from the victim's shorts was transfer DNA from the bed when the victim laid down on it. As to Ziad's confession to police, Clark's strategy was to convince the jury

5

that Ziad was tricked by police into giving the statement. Clark believed that by using the minimization technique, the detectives had tricked Ziad into a false confession. So we examine Clark's actions in light of his strategy at trial.

FAILURE TO REQUEST AN INTERPRETER AT TRIAL

In his first issue on appeal, Ziad argues that Clark, who served as both his trial and appellate counsel, was ineffective for failing to request an interpreter for him during trial and that, as a result, he was denied his right to a fair trial.

A defendant's constitutional right under the United States Constitution to be present during criminal proceedings stems from the Sixth Amendment right to confront witnesses and the due process right to attend critical stages of a criminal proceeding. Being present at trial involves more than physical attendance; it requires that the defendant be able to understand what is happening so that he or she can participate in his or her defense. The right to be present includes a right to have trial proceedings translated into a language that the defendant understands. See *State v. Calderon*, 270 Kan. 241, 245, 13 P.3d 871 (2000). Moreover, in Kansas, defendants have a statutory right to an interpreter under K.S.A. 75-4351. The statute is unequivocal in its requirement that a "qualified interpreter shall be appointed . . . for persons whose primary language is one other than English." K.S.A. 75-4351. This court has held that the statute is mandatory not directory. See *State v. Ahmedin*, No. 105,378, 2012 WL 1919925, at *9 (Kan. App. 2012) (unpublished opinion).

Unlike K.S.A. 75-4351, the United States Constitution does not require an interpreter be provided in all cases in which a defendant's primary language is not English. But failure to provide an interpreter implicates the fundamental right of the Sixth Amendment to confront witnesses and the protections of the Due Process Clause of the Fourteenth Amendment to attend critical stages of the criminal proceeding.  See *State v.*

6

*Atkinson*, 276 Kan. 920, 927, 80 P.3d 1143 (2003) (right to confront witnesses is a fundamental right); *State v. McGinnes*, 266 Kan. 121, 130, 967 P.2d 763 (1998) (right to be present at all critical stages is a fundamental right). So how high must the defendant's language barrier be before this constitutional threshold is met? Because the determination is likely to hinge upon various factors, including the complexity of the proceedings, the defendant's knowledge of English, and the testimony presented during trial, trial courts are given wide discretion to determine the necessity of an interpreter. *United States v. Carrion*, 488 F.2d 12, 14 (1st Cir. 1973); see *Valladares v. United States*, 871 F.2d 1564, 1566 (11th Cir. 1989).

There is no dispute that Ziad's primary language is Arabic. At Ziad's K.S.A. 60-1507 hearing, he presented a number of witnesses who testified regarding his ability to speak and understand English. The witnesses included his attorney, a language expert, the individual who translated preliminary proceedings for Ziad, and the state employee who encountered Ziad and Ziad's interpreter at the driver's license bureau. Additionally, a video recording of the deposition of an Army officer Ziad worked with as a translator in Iraq was admitted into evidence and played for the court. For its part, the State called Jeremy Platt, the attorney who assisted Clark with the trial, to testify.

Neither Clark nor Platt tested Ziad's understanding of English and did not request an interpreter for his trial, although Ziad's first attorney had requested one and Ziad was provided an Arabic interpreter during the preliminary hearing. In fact, Ziad had not handled any legal hearings in the case without an interpreter.

Clark believed that by not using an interpreter they could increase their chances of success. Clark asserted that he discussed the need for an interpreter with Ziad, and they agreed to proceed to trial without an interpreter. More accurately, he specifically advised Ziad against using an interpreter and Ziad agreed. Clark did not want the jury to "feel that Ziad was trying to hide behind a language barrier that didn't exist." He also thought the

fact that Ziad had been an interpreter for the military would further indicate he was trying to hide behind the language barrier. Clark admitted that he did not investigate the complexity of the interpreting Ziad was asked to handle for the U.S. military.

Moreover, Clark did not consider how he could have explained Ziad's use of an interpreter to the jury during voir dire and inquired of the potential jurors if any juror would hold it against Ziad that he used an interpreter. In addition, he did not consider a special jury instruction regarding the use of an interpreter. Although the issue has not been raised in Kansas, some organizations have advocated for an instruction similar to the following when an interpreter is used, particularly when the defendant speaks some English:

> "No matter what language people speak, they have the right to have their testimony heard and understood. You are about to hear a trial in which an interpreter will translate for one or more of the participants.
>
> . . . .
>
> "Keep in mind that a person might speak some English without speaking it fluently. That person has the right to the services of an interpreter. Therefore, you shall not give greater or lesser weight to a person's translated testimony based on your conclusions, if any, regarding the extent to which that person speaks English." 3 Crim. Prac. Manual § 98:2 Jury instruction regarding use of interpreter (2011).

See also Model Civ. Jury Instr. 9th Cir. 1.17 (2007) ("You must not make any assumptions about a witness or a party based solely upon the use of an interpreter to assist that witness or party."). Clark did not consider nor discuss with Ziad how the use of such an instruction, if given, would have mitigated his concerns. He simply opted not to use an interpreter.

Finally, the waiver of an interpreter was not accomplished before the trial judge, and Clark did not explain to Ziad that he had a statutory right to an interpreter under K.S.A. 75-4351. "'[W]aiver of an interpreter is not a decision for [defendant's] counsel or the Court to make. It is the defendant's decision, after the Court explains to him the nature and effect of a waiver.'" *United States v. Osuna*, 189 F.3d 1289, 1292 (10th Cir. 1999) (quoting *United States v. Tapia*, 631 F.2d 1207, 1209 [5th Cir. 1980]).

Clark was aware that Ziad would not be able to understand at least some of the testimony at trial. He agreed that the DNA evidence would be difficult for Ziad to understand and he would not have understood the prosecutor's closing statement. During his own testimony at trial, Ziad was speaking in broken English, and Clark was concerned the jury may have a hard time understanding him because of both the language barrier and the speed at which he spoke. In addition, the court reporter was having a difficult time understanding Ziad. The judge noted during the trial that it was sometimes difficult to understand Ziad, so he allowed leading questions. Clark agreed that Ziad clearly did not understand some of the questions propounded of him during trial. He agreed that Ziad did not understand some fairly simple words like "'compel,'" "'occurred,'" "'lawyer,'" and "'court appearance.'"

According to the professionals that tested Ziad, his understanding of English was extremely limited. He did not understand the words "'appointed'" or "'remain silent,'" to name a few. It was very difficult for him to process several sentences at a time without suffering from language fatigue. He was often just responding to the last sentence asked, rather than processing it in context with the prior sentences. It would have been very easy to trick him due to the language problem. Evidence was presented that approximately 1 year before this incident, Ziad took an interpreter with him to get a Kansas driver's license and had to use the picture test rather than the written test. In addition, the interpreter for Ziad in the preliminary hearing—a mathematics professor from Kansas State University—testified that Ziad's English was very limited. In fact on a scale of 0 to

10, he rated it .01. He testified that Ziad's English was woefully inadequate to go through a court proceeding without an interpreter. The U.S. Army Captain that supervised Ziad in Iraq indicated that their communication in English was at an elementary level. He analogized Ziad's ability as a little better than his 5-year-old daughter, who was entering kindergarten. It was his belief that Ziad would not have the English skills, vocabulary, or stamina to understand an entire trial without an interpreter. Although Ziad lived in the United States for 14 months prior to his arrest, he lived in a household with other Arabic speakers. So he was hardly immersed in the English language. When he interpreted for the U.S. Army in Iraq, again he continued to live with Arabic speakers.

Moreover, the complexity of the proceedings was substantial. Not only were the technical aspects of DNA transference and police minimization techniques at issue, if convicted of the charges, Ziad faced 25 years to life in prison, among the stiffest penalties that can be imposed under Kansas law. See K.S.A. 2016 Supp. 21-6627(a)(1)(D). Finally, since Ziad is in this country as an asylum seeker, his felony conviction will likely result in his deportation to Iraq, where his life may be at risk. See 8 U.S.C. § 1227(a)(2)(A)(iii) (2012) (allowing deportation of "[a]ny alien who is convicted of an aggravated felony at any time after admission"); 8 U.S.C. § 1101(a)(43)(A) (2012) ("'aggravated felony'" means "murder, rape, or sexual abuse of a minor"). The stakes were very high for Ziad.

After hearing all of the evidence, the district court made extensive findings of fact. The following findings are relevant to this issue:

- "Petitioner had worked as an interpreter for the U.S. Army from 2004 to 2009."
- "Petitioner came to the U.S. in April of 2009 and worked over 8 months at Fort Riley, Kansas, training soldiers how to deal with his culture."
- "Petitioner had lived and worked in the US for 14 months at the time of his arrest, and for over 2 years at the time of trial."

10

- "The court finds the State's response persuasive concerning the conflict of evidence on whether the petitioner agreed not to use an interpreter. . . . [T]he court makes the factual finding that Mr. Clark, Mr. Platt, and the defendant thoroughly discussed the use of an interpreter and jointly came to the decision not to use one."

- "A review of the petitioner's recorded interview shows petitioner had an excellent understanding of English on all subjects, including what DNA was, and he very clearly described the sex acts he participated in. A reading of his testimony at trial . . . shows petitioner had an excellent understanding of English. Despite the great effort of petitioner to show that petitioner did not understand English sufficient to proceed to trial without an interpreter, the court finds there is substantial competent evidence to support the finding that petitioner adequately understood English to proceed to trial without an interpreter and possessed the 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding,' required by *Calderon*."

These factual findings are reviewed to determine whether there is substantial competent evidence—evidence which a reasonable person could accept as sufficient to support a conclusion—in the record to support them. *Bowen*, 299 Kan. at 343; *Gannon v. State*, 298 Kan. 1107, 1175, 319 P.3d 1196 (2014). Review of several of the district court's factual findings is made easy by the court's direct citation to the trial record. Other findings are supported by the testimonies of Clark and Platt at the K.S.A. 60-1507 hearing. But when these findings are combined with a plethora of evidence that Ziad was not fluent enough in English to proceed to trial without an interpreter, we cannot find that the substantial competent evidence standard has been met. Even if one assumes that Clark and Platt were in the best position to evaluate Ziad's language abilities at the time of trial, their testimony does not support such a conclusion. They reached what they believed to be a reasonable trial strategy, without fully investigating Ziad's ability to understand the

11

testimony and legal arguments at his own trial. Not only did they not investigate, but they ignored clear indications that Ziad could not effectively understand what was going on during the trial. "[I]t is often the case that a person who understands and speaks with reasonable ease the language of the street or of ordinary business encounters difficulty and embarrassment when subjected to examination as a witness during proceedings in court." *State v. Inich*, 55 Mont. 1, 11, 173 P. 230 (1918).

In conclusion, we find that Ziad's attorney was ineffective for not requesting that he have an interpreter at trial. He placed a questionable trial strategy above Ziad's statutory rights and constitutional rights without discussing with him that he had such rights. We do not believe a reasonable attorney would have placed a fear of the jury's perception of the defendant—a perception that could have been adequately addressed during voir dire and through jury instructions—over and above the defendant's ability to understand the proceedings. Ziad deserved more. "Particularly inappropriate in this nation where many languages are spoken is a callousness to the crippling language handicap of a newcomer to its shores, whose life and freedom the state by its criminal processes chooses to put in jeopardy." *United States ex rel. Negron v. State of New York*, 434 F.2d 386, 390 (2d Cir. 1970).

Having concluded that counsel was ineffective, we turn to the next step, whether the error prejudiced Ziad. *Sola-Morales*, 300 Kan. at 882.

We begin by examining the reasons behind the statutory requirement that interpreters be appointed in certain cases. Clearly, the goal of K.S.A. 75-4351 is to protect the constitutional right of defendants to be present at their trials. Courts have interpreted the right to be present to mean something more than that the defendant is in the courtroom; "[i]t assumes that a defendant will be informed about the proceedings so he or she can assist in the defense." *Calderon*, 270 Kan. at 245. As a result, the "right to

be present includes a right to have trial proceedings translated into a language that [the defendant] understands." 270 Kan. at 245.

Citing *Calderon*, Ziad argues that this court should presume prejudice because Clark's error resulted in the denial of his fundamental rights—the right to be present at all critical stages and the right to confront the witnesses against him. Alternatively, Ziad argues that he was actually prejudiced because he was not able to effectively assist counsel with his own defense. In support of his contention, Ziad argues that C.J.'s credibility was in dispute and he was unable "to meaningfully interact with and assist counsel in confronting C.J. and other witnesses."

As the State points out, a presumption of prejudice is only appropriate in limited situations. It is only in situations in which an error "'implicate[s] a basic consideration of fairness or undermine[s] the function of a criminal trial'" that a presumption of prejudice should be made. *State v. Englehardt*, 280 Kan. 113, 124, 119 P.3d 1148 (2005) (quoting *State v. Mann*, 274 Kan. 670, 682-84, 56 P.3d 212 [2002]). In the context of determining whether the district court's failure to appoint an interpreter jeopardized a defendant's constitutional right to be present at his or her trial so that prejudice should be presumed, this court has instructed that it is necessary to determine whether the defendant was able to understand the proceedings. *State v. Dosal*, No. 89,436, 2004 WL 795898, at *1 (Kan. App. 2004) (unpublished opinion); see also *Ahmedin*, 2012 WL 1919925, at *8.

As previously discussed, the district court found that Ziad was able to understand what was happening at his trial and effectively participate in his own defense—a finding that is not supported by substantial competent evidence. As a result, under the facts of this particular case we believe it is appropriate to presume prejudice, as did our Supreme Court under the facts of *Calderon*. 270 Kan. at 246, 253 (presuming prejudice when court instructed interpreter not to interpret closing arguments); see *Osuna*, 189 F.3d at 1292-93 (plain error found when transcripts suggested language difficulties inhibited defendant's

ability to communicate with his lawyer on direct examination and thus to make his testimony understood by the court and the jury, even though lawyer affirmatively stated he did not want an interpreter). We recognize that it is only under the most egregious circumstances that structural error will be an appropriate finding and prejudice presumed. Our courts have often found that failure to provide an interpreter or failure to otherwise allow a defendant to be present for all stages of his or her trial may, at times, be subject to a harmless error analysis. See *Howard v. State*, No. 106,782, 2012 WL 6217193, at *5-6 (Kan. App. 2012) (unpublished opinion) (listing Kansas Supreme Court cases where no fundamental error was found even though defendant was absent for some portion of the trial proceedings).

But if the defendant's absence implicates the basic consideration of fairness to the defendant or undermines the function of the trial, the court will find a fundamental error and presume prejudice. We find the facts in this case to be much more egregious than the fundamental failure found in *Calderon*, where an interpreter was denied only for closing argument. Moreover, it was more egregious than the fundamental failure that required reversal in *Hilson v. State*, No. 99,421, 2009 WL 311819, at *5 (Kan. App. 2009) (unpublished opinion), where the court reversed when the defendant was allowed to leave the courtroom to use the restroom but testimony was allowed to proceed in his absence. Here, the denial of the right to be present was for the whole trial. It certainly implicates the basic consideration of fairness to Ziad.

Although we could end our analysis here and reverse Ziad's convictions for his attorney's ineffectiveness in failing to request an interpreter, there were other significant errors committed by trial counsel that further bolster the ultimate result here. We choose to address those as well.

14

FAILURE TO RAISE INTERPRETER ISSUE ON DIRECT APPEAL

Ziad next argues that Clark was ineffective for not raising the issue of the district court's failure to appoint an interpreter on direct appeal. The same two prongs that are used to evaluate claims of ineffective assistance of counsel at trial apply to the review of claims of ineffective assistance on direct appeal: error and prejudice. See *Miller v. State*, 298 Kan. 921, 930-31, 318 P.3d 155 (2014).

It is not, per se, ineffective assistance of counsel for an appellate attorney to fail to raise an issue on direct appeal. *Laymon v. State*, 280 Kan. 430, 439-40, 122 P.3d 326 (2005). When deciding which issues to pursue on direct appeal, an attorney "'should carefully consider the issues, and those that are weak or without merit, as well as those which could result in nothing more than harmless error, should not be included.'" 280 Kan. at 440.

Had Clark raised this issue on appeal, this court would have reviewed it for abuse of discretion. See *Ahmedin*, 2012 WL 1919925, at *8 ("the constitutional right of a defendant to an interpreter is a matter within the trial court's discretion"). Given our finding that evidence does not support a finding Ziad was able to understand the proceedings in the absence of an interpreter, there is a reasonable probability that this court would have found that the district court abused its discretion when it failed to appoint an interpreter. Giving full consideration to the standard of review, Clark provided ineffective assistance when he opted not to raise this issue on direct appeal.

FAILURE TO FILE A MOTION TO SUPPRESS THE CONFESSION

Ziad next argues that Clark was ineffective for failing to file a motion to suppress his statement to the police. Although a motion to suppress can only be filed by the defendant pursuant to K.S.A. 22-3215, a motion for a hearing pursuant to *Jackson v.*

15

*Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), can be filed by the State for the same purpose—to determine the admissibility of a confession. There is no requirement that a court conduct both. *State v. Miles*, 233 Kan. 286, 288-89, 662 P.2d 1227 (1983). In addition, the specific question of the voluntariness of a waiver of *Miranda* rights is a question of law that we determine de novo based upon the totality of the circumstances. *State v. Mattox*, 280 Kan. 473, 483-84, 124 P.3d 6 (2005).

In this case, the State had already filed a motion pursuant to *Jackson v. Denno* prior to Clark entering the case. Testimony had already been presented from Detective Ryan Runyan—who had previously served in Iraq and conducted Ziad's interrogation—that in Iraq the police use force to coerce confessions from individuals. Runyan also testified that he did not believe individuals in Iraq have anything like *Miranda* rights. But upon entering the case, rather than finish the hearing, Clark stipulated to the voluntariness of the confession.

Ziad was not provided an interpreter during his conversation with police, even though K.S.A. 75-4351(e) requires it. The fact that an interpreter was not provided when a defendant's primary language is not English is one factor to consider when determining the voluntariness of a confession and would have been a basis for Clark to challenge the confession. *State v. Pham*, 281 Kan. 1227, 1240, 136 P.3d 919 (2006). In addition, during his interrogation, Ziad was asked to sign documents, including a *Miranda* waiver and a consent to search his house, but he clearly stated that he could not read English. Although the detectives read his *Miranda* rights to him, they neglected to ask him if he understood the rights and whether he wished to waive his rights and speak with them as outlined on the form. Ziad expressed a lack of understanding of what the term "'lawyer'" meant. Even though it would clearly be easier to conclude Ziad was tricked because of his limited understanding of English and the American justice system, Clark testified at the K.S.A. 60-1507 hearing that he did not believe this was a winning strategy and he did not want to upset the judge by filing a motion that Clark believed lacked merit. But Clark did not

16

even have to file a motion, he simply needed to complete the *Jackson v. Denno* hearing which had already commenced. It is unclear to us how Clark would believe the judge would be upset with him filing what he believed to be a meritless motion, if the State had already filed a motion to introduce the confession and all he had to do was mount a defense. Instead, contrary to his client's best interests and contrary to his stated trial strategy, Clark entered a written stipulation to the voluntariness of the confession, which his client did not sign or see prior to trial and then failed to object when it was entered into evidence by the prosecution.

In its opinion, the district court concluded that "Mr. Clark's decision to not challenge the voluntariness of the defendant's statement was an informed decision based on his professional judgment after a reasonable and thorough investigation." In reaching this decision, the district court adopted the findings of fact and conclusions of law set forth in the State's memorandum response to Ziad's petition. Those findings included:

> "Mr. Clark's decision to not challenge the voluntariness of the defendant's statement was an informed decision based on his professional judgment after a reasonable and thorough investigation. As such, it is not challengeable.

> ". . . Mr. Clark did not simply disregard the option of challenging the defendant's statement. . . . .

> "Based upon his investigation and research into the law, Mr. Clark ultimately came to the conclusion that the defendant understood his *Miranda* rights; that his statement was voluntarily given and that a challenge would be meritless. . . . It is the defendant's burden to establish that Mr. Clark's decision was not based upon his reasonable professional judgment. [Citation omitted.] The defendant has failed in this burden."

17

The district court further found that "[a] review of the facts readily demonstrates that the petitioner's statement to Detective Runyan [the interrogating officer] was the product of his free and independent will."

Again, we find that there is not substantial competent evidence in the record to support the district court's findings regarding Clark's performance.

At the K.S.A. 60-1507 hearing, Clark testified that he spoke with Ziad about his statement to the police and his understanding of his *Miranda* rights and watched the video of the interrogation, all of which led him to the conclusion that Ziad understood his rights and voluntarily confessed. Platt also testified that he and Clark spoke with Ziad about his confession and, with Ziad's input, arrived at the decision not to challenge its voluntariness. Clark testified that after gathering information on the circumstances surrounding the confession, he considered the likelihood of success on a motion to suppress and weighed that against the likelihood that he would waste favor with the judge if he filed a motion he was unlikely to win.

The question then is whether these facts support a finding that Clark's failure to file a motion to suppress Ziad's confession was a reasoned professional judgment. The State argues that it was citing *Marler v. State*, No. 108,722, 2013 WL 5870049 (Kan. App. 2013) (unpublished opinion), *rev. denied* 300 Kan. 1103 (2014). There, Randy Marler alleged that he received ineffective assistance of counsel because his trial attorney, Sean Shores, did not file a motion to suppress his written and oral statements to the police. At the K.S.A. 60-1507 hearing, Shores testified that he investigated the circumstances surrounding Marler's confession and concluded there was no basis for filing a motion to suppress. Specifically, Shores cited to the video recorded interview of Marler's interrogation and confession which made clear that the interrogating officer had complied with *Miranda* and that Marler's confession was voluntary. This court upheld the

18

district court's determination that Shores' decision not to file a motion to suppress was a matter of trial strategy. 2013 WL 5870049, at *4.

The situation here is somewhat different than that in *Marler*. In *Marler*, there was no indication that Marler's confession may have been involuntary other than his later assertion that the confession was false. Here, there is at least some evidence that Ziad's confession was involuntary. As a result, it does not seem prudent to simply default to Clark's judgment that this was a valid trial strategy; actual consideration of the merits of Ziad's claim is necessary.

This analysis begins by considering how the district court likely would have resolved a motion to suppress. When determining whether a confession was voluntary, a district court looks at the totality of the circumstances, paying special attention to:

> "'(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language.'" *State v. Johnson*, 286 Kan. 824, 836, 190 P.3d 207 (2008).

The interview of Ziad took place in an interview room at the police station in the middle of the day and lasted less than an hour. Two officers were present, though neither was wearing a police uniform. Ziad was not restrained during the interview. Although he did not ask to communicate with anyone else during the course of his interview, there is no indication such a request would have been denied. Ziad was a 29-year-old high school graduate who had been in the United States for 14 months at the time he was detained and interrogated.

Ziad complains that Runyan did not conduct the interview fairly because he attempted to minimize the seriousness of the situation and mislead Ziad into believing

19

that he was investigating to determine whether the sex with C.J. was consensual, not letting on until after Ziad had confessed to having sex with C.J. that the real issue was that she was only 13. Factors that may raise red flags when considering whether an interrogation was conducted fairly are if the police: threatened a suspect or promised some benefit in exchange for cooperation, minimized the seriousness of confessing to involvement in a crime, falsely told the suspect that there was evidence indicating his or her involvement in the crime, or used other deceptive techniques. See *State v. Swanigan*, 279 Kan. 18, 32-36, 106 P.3d 39 (2005); *State v. Fernandez-Torres*, 50 Kan. App. 2d 1069, 1082, 337 P.3d 691 (2014).

After clarifying the definition of consensual, Runyan asked Ziad:

"So I know that on Saturday, with the girl, what I'm looking for if it was consenting, consensual between you and the girl.

. . . .

". . . But there is some evidence. You understand evidence? Evidence is things that we have, okay, that can show there is something that happened. And so what I'm looking for I want you to be honest with me. It is called—if there is some consenting between you and the girl. I just want to see if it is was consenting or not. See if she wanted to have sex or if you wanted to have sex."

In response, Ziad denied having sex with C.J. several times. Runyan then asked again: "What I'm looking for is did she say yes and did you say yes. It is called consenting. All I'm looking for. So I know you had sex with her. But I want to know did she also want to have sex. Did she say yes to sex?" In response, Ziad finally admitted that he had consensual sex with C.J. Runyan then asked Ziad to walk him step by step through what happened. Before getting to a description of the sex acts, Runyan asked another series of questions about consent: "So now you're in your room. She's saying yes?";

20

"You know, she says yes?" "Because if she said no what would happen? Is no good or bad?" and "She said yes. So you're being honest with me?" After each question Ziad confirmed that the sex was consensual.

It was only after Ziad had fully described the sex acts he and C.J. participated in that Runyan asked if Ziad knew how old C.J. was. Ziad said no and Runyan moved on, back to a recap of the episode. After Ziad again described all of the sex acts, Runyan returned to the issue of C.J.'s age, asking Ziad to guess how old C.J. was. When pressed, Ziad said that he believed C.J. to be 18 or 19. Ziad appeared shocked and upset to learn that C.J. was only 13.

Although Runyan clearly attempted to mislead Ziad regarding the pertinent issue and minimized the seriousness of confessing to having consensual sex with C.J., standing alone that is not enough for a court to conclude that Ziad's confession was involuntary. In *Swanigan*, police repeatedly lied to Swanigan during their interrogation of him, telling him that they knew he had committed a crime because they found his finger prints at the scene. Police attempted to compel Swanigan to confess by suggesting positive consequences if he cooperated and negative consequences, including charging him with additional crimes, if he did not. Our Supreme Court concluded that the "police were free to lie about evidence that fingerprints were found . . . and confirmed to be Swanigan's," and that "without more, a law enforcement officer's offer to convey a suspect's cooperation to the prosecutor is insufficient to make a confession involuntary." 279 Kan. at 32-33. But the court was concerned with the officers' implications that failure to cooperate or confess would have negative consequences because such threats implicated Swanigan's right to remain silent.

In the end, the *Swanigan* court held that a totality of the circumstances, including questionable police behavior in addition to Swanigan's "low intellect and susceptibility to being overcome by anxiety," rendered his confession involuntary. 279 Kan. at 39. The

21

court reached that conclusion recognizing that none of the alleged errors standing alone would have been sufficient to invalidate Swanigan's confession but that the "combination of all of them in this case leads us to conclude as a matter of law that . . . [the] statement was not the result of his free will, but was involuntary." 279 Kan. at 39. We have a similar combination of factors here that make us unwilling to conclude beyond a reasonable doubt that Ziad's confession would have been deemed voluntary.

The police minimization technique in conjunction with Ziad's inability to speak and understand English weigh in favor of finding his confession was involuntary. In addition, Runyan testified that in Iraq the police use force to coerce confessions from individuals. It is not unreasonable to conclude that Ziad may have been pressured to confess because of his fear that force might be used. Finally, Ziad's lack of understanding of the words used in the oral explanation of his *Miranda* rights coupled with his inability to read what was placed in front of him would also weigh in his favor in the voluntariness calculus. It is clear that Ziad appeared to be confessing to criminal acts. That is not the issue. The issue for the district court to decide would have been whether his confession was freely and voluntarily given with an understanding of his rights under *Miranda*. We do not believe that was a foregone conclusion. Because the confession was a central part of Clark's defense strategy, the failure to file a motion to suppress or even mount a defense at the *Jackson v. Denno* hearing fell below the broad range of reasonable professional assistance. See *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). We find that the performance of defense counsel was deficient under these circumstances.

STIPULATING TO THE VOLUNTARINESS OF THE CONFESSION

In his next issue on appeal, Ziad makes an extension of his argument that Clark erred when he failed to file a motion to suppress Ziad's confession, arguing that Clark erred when he stipulated to the voluntariness of the confession. The district court concluded that Clark's decision to stipulate to the voluntariness of Ziad's confession did

22

not constitute deficient performance. In reaching this conclusion, the district court accepted Clark's argument that his strategy at trial was not to contest the voluntariness of the confession but to demonstrate to the jury that Ziad was tricked into confessing.

The district court erred in its conclusion. If Clark's goal was, as he stated, to convince the jury that Runyan "employed a minimization technique" and "tricked" Ziad into confessing, stipulating to the voluntariness of the confession completely undermined his argument. As discussed above, police fairness is one factor that is considered when determining whether a confession was voluntary. *Johnson*, 286 Kan. at 836. Two factors that would lead a court to find that police treated a suspect unfairly are if an officer minimized the seriousness of a crime or used other deceptive techniques during an interrogation. See *Swanigan*, 279 Kan. at 32-36.

By stipulating to the fact that Ziad's confession was voluntary, Clark conceded that the confession was fairly obtained, *i.e.*, not obtained using deceptive techniques. Stipulating to the voluntariness of Ziad's confession cannot be considered a reasonable strategic move when a fundamental part of the defense strategy was to question the voluntariness of the confession. Clark's performance was deficient in this regard. Clark erred further when he allowed the stipulation to be admitted into evidence without objection. Clark testified, that had he objected, he is certain that the district judge would have sustained his objection and kept it out of evidence.

Ziad was clearly prejudiced by Clark's error. The prosecutor introduced the stipulation into evidence and then referred to it prominently in her closing statement. As Clark indicated one of the pillars of the trial was Ziad's confession. By stipulating to its voluntariness and allowing its admission into evidence, Clark prejudiced his own defense strategy.

23

Ziad next argues that Clark was ineffective for failing to object to a question the prosecutor asked one of the State's witnesses. At trial, the State called Amanda Nall to testify regarding the sexual assault examination she conducted of C.J. several days after her alleged rape by Ziad. During her direct examination, the following exchange took place without objection from Clark:

"Q. Okay. What were your findings during C.J.'s sexual assault examination?

"A. That there was no obvious injuries.

"Q. Okay. Based on your training and experience is a lack of obvious injury consistent with a sexual assault?

"A. Yes."

In *State v. Tully*, 293 Kan. 176, 262 P.3d 314 (2011), our Supreme Court, examining a similar line of questioning for a slightly different purpose, held:

"[T]here is a distinction between evidence of physical or mental trauma and evidence establishing rape. While Dr. Hofman was not asked to state an opinion as to whether A.C. had been raped, she was asked to state an opinion as to whether the lack of traumatic injury was counter to a finding of rape. This conclusion requires application of the law— the legal elements of rape—and there is no showing that Dr. Hofman was qualified to know those elements." 293 Kan. at 204-05.

The *Tully* court went on to conclude that while the district court abused its discretion in finding that Dr. Hofman was qualified to testify to the legal conclusion, the error was not, by itself, reversible. 293 Kan. at 205. A similar conclusion can be reached here. While *Tully* indicates that Clark should have objected to Nall's testimony that a lack

24

of injury can be consistent with a finding of sexual assault, that error did not prejudice Ziad.

At the close of evidence, the jury was instructed that to find Ziad guilty of rape it must only find that the State proved Ziad "had sexual intercourse with [C.J.]" and that C.J. "was under 14 years of age when the act of sexual intercourse occurred." Similarly, to convict him of aggravated sodomy, the jury only needed to find that Ziad "engaged in sodomy with [C.J.]" who was "under 14 years of age." Although a charge of rape or aggravated criminal sodomy can be premised on a nonconsensual or forceful act, here, force and consent were not at issue. This case was simply about whether Ziad had sex or engaged in sodomy with C.J. at a time when she was too young to consent to either act. Thus, whether or not C.J. suffered injuries had no bearing on the outcome of the case.

The jurors, based on their common knowledge and experience, would have known that it is possible for a man and a woman to have sex or engage in acts of sodomy without injury to the woman. It, therefore, would not have influenced the jury to hear that an incident could legally qualify as a sexual assault based on the circumstances of this case and not result in injury. See K.S.A. 2016 Supp. 75-452 (defining sexual assault as any act defined in article 55 of chapter 21 of the K.S.A., including K.S.A. 2016 Supp. 21-5503[a][3], sexual intercourse with a child under the age of 14).

Accordingly, while Clark erred, he was not ineffective for failing to object to the nurse's testimony.

FAILURE TO OBJECT DURING CROSS-EXAMINATION OF THE DEFENDANT

Ziad next argues that Clark was ineffective for not objecting quickly enough to a line of questioning by the prosecutor that invaded his right to remain silent and by failing to object to questions that improperly introduced bad character evidence. A prosecutor

commits misconduct (now described as prosecutorial error) when he or she "attempt[s] to obtain a conviction in a manner that . . . offend[s] the defendant's constitutional right to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

Ziad first takes issue with questions the prosecutor asked about the difference between his confession and trial testimony. After listening to him testify on direct examination that he had not, in fact, had sex with C.J., the prosecutor asked Ziad a series of questions related to whether he ever told the police or anyone else the version of events he related during his testimony. After six such questions, Clark objected that the "line of questioning is starting to invade [Ziad's] right to remain silent." The district court agreed and instructed the prosecutor to move on.

Ziad argues that Clark's failure to more quickly object to the questions prejudiced him by violating his right to silence under the Fifth Amendment to the United States Constitution. In support of his argument, Ziad cites *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). There, the Supreme Court considered whether "a state prosecutor may seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest." 426 U.S. at 611. The Court held that "use of the defendant's post-arrest silence in this manner violates due process." 426 U.S. at 611.

In recent years, the Kansas Supreme Court has expanded on *Doyle*. In *State v. Hernandez*, 284 Kan. 74, 159 P.3d 950 (2007), the Kansas Supreme Court addressed a situation similar to the one at issue here where the defendant was not silent after he was read his *Miranda* rights, but rather talked to the police and told a story that changed dramatically at trial. After recounting a version of events inconsistent with what he had told the police after his arrest, the prosecutor cross-examined Hernandez, asking him why, if he had an alibi, he had not told police that fact after they charged him. In

concluding that this was error, the *Hernandez* court first reaffirmed prior Kansas Supreme Court holdings which clarified that "a prosecutor may impeach a defendant's trial testimony through use of a prior inconsistent statement given by the defendant after he or she was provided *Miranda* warnings" without running afoul of *Doyle*. 284 Kan. at 84. The court reasoned that the questions the prosecutor asked regarding the difference in Hernandez' prearrest statements and his trial testimony were permissible. 284 Kan. at 90-91.

However, questions about why Hernandez failed to tell officers he had an alibi during his interrogation or the subsequent year and a half prior to trial violated his Fifth Amendment right to silence. A prosecutor crosses the line when he or she shifts from asking about inconsistent statements to asking a defendant why he or she did not offer a particular version of events or piece of exculpatory information at any prior point despite the fact that the defendant had been in communication with the police. 284 Kan. at 91. Such questions violate a defendant's right to remain silent in the same way questions about a defendant's postarrest silence would.

Here, the prosecutor's questions to Ziad regarding why he had not told anyone, after he was charged with rape, that he actually had not had sex with C.J., despite his initial confession to the contrary, crossed the line established by *Hernandez*. While Clark apparently recognized this and objected, he only did so after a number of unconstitutional questions had been asked and answered. The question then is whether Clark's objection was timely.

For objections to be valid, they must be both timely and specific. K.S.A. 60-404. The purpose of this rule is to give trial courts a full opportunity to consider and decide evidentiary issues as they arise, thereby reducing the instances in which verdicts are overturned on appeal. *State v. McCaslin*, 291 Kan. 697, 708, 245 P.3d 1030 (2011), *overruled on other grounds by State v. Astorga*, 299 Kan. 395, 324 P.3d 1046 (2014).

27

Here, Clark's objection came after several questions had been asked but still sufficiently contemporaneously to the questions that the district court was able to consider whether the prosecutor committed an error at a time when the mistake could have been corrected. A defense attorney may object to a line of questioning, *i.e.*, after more than one question of an impermissible nature has been asked, thereby obtaining a ruling and preserving the issue in question for appeal. See *State v. Houston*, 289 Kan. 252, 267-68, 213 P.3d 728 (2009).

Although Clark could, and perhaps should, have objected sooner to the prosecutor's questions, Clark's delayed objection did not constitute deficient performance under a totality of the circumstances.

Ziad additionally argues that Clark was ineffective for not objecting to the prosecutor's questions about Ziad's conversation with his wife. At the K.S.A. 60-1507 hearing, Clark admitted that this line of questions was objectionable and that "in the calm of hindsight, I wish I would have [objected]." Accepting his admission, Clark was ineffective for failing to object.

While the irrelevant questions about Ziad's lies of omission and infidelity to his wife certainly did not raise his standing in the eyes of the jury, in light of all the evidence, there is not a reasonable probability that it influenced the verdict. Ziad's defense rested on the fact that he had sex with someone in his bed on the night of the party C.J. attended at his house. The fact that he had a wife and that she was not the person he had sex with that night came out during Ziad's direct examination when Clark was asking questions aimed at establishing the location of people and objects in Ziad's living room. Thus, the prosecutor's questions did not introduce any new information but rather highlighted unflattering facts that the jury already knew. Even if the questions caused the jury to question Ziad's ethics or even his veracity, that doubt is unlikely to have influenced the verdict. The jury could already draw those conclusions from Clark's direct examination.

28

### FAILURE TO CROSS-EXAMINE JOHN ESQUIVEL ABOUT THE TERMS OF HIS PLEA AGREEMENT

Ziad next contends that Clark erred when he failed to question the State's witness, John Esquivel, about the terms of his plea agreement. Ziad cites to *Wilkins v. State*, 286 Kan. 971, 987, 190 P.3d 957 (2008), in support of his argument. However, in doing so, Ziad ignores more relevant passages of *Wilkins* that undercut his argument.

Wilkins filed a K.S.A. 60-1507 motion arguing, in part, that his trial attorney was ineffective for failing to cross-examine one of the State's witnesses about the plea agreement he received. Our Supreme Court found that although the attorney did not cross-examine the witness regarding the terms of his plea agreement, the information came into evidence through other witnesses so it was not error for the attorney not to solicit the information from the witness himself. 286 Kan. at 986. The same situation exists here. During his cross-examination of Esquivel, Clark asked him whether testifying at the trial was one of the terms of his plea agreement. Evidence of additional terms of Esquivel's plea was elicited from Esquivel's attorney, Jillian Waesche-Seaton. Clark cross-examined Waesche-Seaton about the terms of the agreement and highlighted the fact that Esquivel received both conviction of a less severe crime than that charged and an agreement from the State to recommend a reduced sentence in exchange for his guilty plea.

Considering the totality of the circumstances, Clark did not err when he failed to cross-examine Esquivel about the terms of his plea agreement because that fact was clearly established by another witness.

Ziad next argues that Clark erred when he failed to object to prosecutorial misconduct during closing arguments. A prosecutor errs when his or her action "fall[s] outside the wide latitude afforded prosecutors to conduct the State's case and attempt[s] to obtain a conviction in a manner that . . . offend[s] the defendant's constitutional right to a fair trial." *Sherman*, 305 Kan. at 109.

Ziad specifically complains that Clark should have objected when the prosecutor discussed the fact that the DNA found on C.J.'s shorts only belonged to two people, C.J. and Ziad. During the State's initial closing, the prosecutor said: "But at the end of the day you have two—there was a mixed DNA and you have two people contributing that mixed DNA—C.J. and the defendant. There wasn't three people contributing to that DNA sample, there was two."

Again, during the State's rebuttal the prosecutor stressed:

"If she got seminal fluid on the inside of her shorts from the defendant having sex in his bed with [J.B.] . . . why wasn't [J.B.'s] DNA mixed in there? There was no unknown DNA in the mix. It was the defendant's seminal—defendant's DNA fraction 2 and one of the fraction 1 was a mixture of two people, not three people. Not the defendant, C.J., and an unknown. Two people: The defendant and C.J."

During the trial, Brandy Bertrand, a forensic biologist for the Kansas Bureau of Investigation, testified that seminal fluid was found on the waistband and drawstring of the shorts C.J. was wearing on the night of the incident. Samples were taken from both places and were tested against the DNA profiles of Ziad, Roger Safford, Jr., and C.J. Examination of the DNA found in those two locations revealed a mixture of DNA "consistent with at least two individuals," C.J. and Ziad. Importantly, Betrand did not testify that the mixtures were exclusively from C.J. and Ziad.

In its order, the district court found that "the prosecutor argued facts that were not in evidence by misstating the DNA evidence in her initial closing statement and in her final rebuttal closing statement, and that the prosecutor's comments were outside the wide latitude allowed in discussing the evidence." But, the district court further found that the comments did not influence the outcome of the case.

The prosecutor clearly misstated the evidence when emphasizing that there were only two individuals who contributed to the DNA profiles found on C.J.'s pants. Clark clearly erred when he failed to object to this misstatement.

We also cannot conclude that this error was harmless based on Clark's defense strategy. His strategy, as it related to the DNA evidence, was not to deny the validity of the result as it related to Ziad but rather to imply that the semen ended up on C.J.'s shorts through second hand contact. The defense's contention was that the sperm was on the bed from a sexual encounter Ziad had with another woman, J.B., earlier in the evening and was transferred to C.J.'s shorts when she laid on the bed during the party. The presence of DNA from additional contributors would have supported this argument. His failure to object torpedoed his own argument.

We recognize that the inference Clark attempted to make was undermined by the testimony of J.B. She testified that although she and Ziad had sex right before the party, the two used a condom and Ziad was still wearing the condom when he left the room after they finished. Thus, J.B.'s testimony put in doubt Ziad's DNA transfer theory. But, Clark had a responsibility to pursue his trial strategy and test the reliability of J.B.'s statements, not sabotage one of the pillars of his case.

31

Ziad next argues that Clark provided deficient appellate representation because he failed to raise the issue of prosecutorial misconduct during closing argument on direct appeal. On appeal of such an issue, if the court determines that the prosecutor exceeded the wide latitude afforded to him or her to craft the State's case, it "must next determine whether the error prejudiced the defendant's due process rights to a fair trial" using the constitutional harmless error test described in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *Sherman*, 305 Kan. at 109. Under that test, "error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record.'" 305 Kan. at 109.

As previously discussed, as one of the pillars of the defense strategy, we are not able to say that the failure to object was harmless and likewise we are not willing to conclude that if raised on appeal this court would have denied relief.

CUMULATIVE ERROR

Finally, Ziad argues that he was denied his right to a fair trial as a result of the cumulative effect of Clark's errors. When an appellant makes such an argument, this court looks at the totality of the circumstances to determine whether the appellant was substantially prejudiced by cumulative errors so that he or she was denied a fair trial. This court examines the errors in light of the entire record, considers how the district court dealt with the errors, weighs the nature and number of errors, examines whether the errors were interrelated, and balances those things against the overall strength of the evidence to determine whether the errors were harmless. *State v. Holt*, 300 Kan. 985,

1007, 336 P.3d 312 (2014). Prejudicial error cannot be found if the evidence against the defendant is overwhelming. *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009).

> "In a cumulative error analysis, an appellate court aggregates all errors and, even though those errors would individually be considered harmless, analyzes whether their cumulative effect on the outcome of the trial is such that collectively they cannot be determined to be harmless. See *State v. Colston*, 290 Kan. 952, 978-79, 235 P.3d 1234 (2010). In other words, was the defendant's right to a fair trial violated because the combined errors affected the outcome of the trial? In a cumulative error analysis, '[i]f any of the errors being aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt.' *United States v. Toles,* 297 F.3d 959, 972 (10th Cir. 2002)." *Tully*, 293 Kan. at 205.

Clark committed six errors during his representation of Ziad: (1) he failed to request an interpreter for Ziad at trial; (2) he failed to file a motion to suppress Ziad's confession or mount a defense at the *Jackson v. Denno* hearing; (3) he stipulated to the voluntariness of Ziad's confession; (4) he failed to object to improper questioning of Nall; (5) he failed to object to questions meant to highlight Ziad's negative character traits; and (6) he failed to object when the prosecutor misstated evidence during closing arguments. We find that the number of errors is substantial, and even if the State could successfully argue that the impact that any one of them had on the trial was insignificant, we cannot ignore the fact that the accumulation of these errors impacted Ziad's ability to receive a fair trial. The errors went to the heart of Clark's defense strategy.

We understand the significance of our ruling today. Our role at this stage of the proceedings is not to decide whether Ziad committed the crimes for which he was convicted but whether his attorney's ineffectiveness denied him a fair trial. We unanimously believe it did and, accordingly, we reverse his convictions and remand this case for further proceedings.

Reversed and remanded.